**KIMBELL FOODS, INC., a corporation, f/k/a Kimbell Milling Company, d/b/a Kimbell Grocery Company, Plaintiff,**

v.

**REPUBLIC NATIONAL BANK OF DALLAS and United States of America, Defendants,**

**State of Texas and City of Dallas, Intervenors.**

**Civ. A. No. 3–74–56–D.**

United States District Court, N. D. Texas, Dallas Division.

Sept. 5, 1975.

---

Vernon O. Teofan, Ungerman, Hill, Ungerman, Angrist, Dolginoff & Teofan, Dallas, Tex., for plaintiff.

John L. Hill, Atty. Gen., Lewis A. Jones, Asst. Atty. Gen., Austin, Tex., for State of Texas.

N. Alex Bickley, City Atty., Ted P. McMaster, Asst. City Atty., Dallas, Tex., for City of Dallas.

Frank J. Betancourt, Gardere, Porter & DeHay, Dallas, Tex., for defendant.

Frank D. McCown, U. S. Atty., Claude Brown, Asst. U. S. Atty., Dallas, Tex., for United States.

## MEMORANDUM OPINION

STEGER, District Judge.

This suit concerns the relative priorities of various parties to $86,672.00, which is being held in escrow by Republic National Bank. Jurisdiction is based upon Title 28, United States Code, Section 2410, this suit being brought to quiet title and foreclose liens upon personal property in which the United States claims an interest.

It will be necessary to cover each of the conflicting claims in greater detail later, however, a brief rendition of the facts might be helpful at this point. The claim of the plaintiff, Kimbell Foods, stems from weekly inventory purchases made on open account by O.K. Super Markets, Inc., a supermarket chain that operated in Dallas, Texas. Kimbell Foods claims that this indebtedness was secured by future advance clauses in security agreements executed by O.K. Super Markets in 1966 and 1968. The Republic Bank and the United States claim entitlement to the entire proceeds in escrow due to a default by O.K. Super Markets on a $300,000.00 Small Business Administration guaranteed loan made by Republic National Bank in February of 1969. Intervenors State of Texas and the City of Dallas are seeking sums owed by O.K. Super Markets for delinquent sales taxes. Additionally, the City of Dallas is asserting a small claim for delinquent ad valorem taxes on O.K. Super Markets' personal property.

As noted previously, all of these parties are asserting claims against funds being held in escrow by Republic National Bank. The source of these funds was a bulk sale of all the fixtures, equipment and inventory at three of O.K. Super Markets' stores. These stores were purchased on February 8, 1971, by Grand City Groceries, Inc., Pat H. Hood and Charles W. Logan.[1] The stores were sold pursuant to an agreement entered into on February 3, 1971, between O.K. Super Markets and the Republic National Bank and approved as to form and substance by the Small Business Administra-

---

[1]. Grand City Groceries purchased the collateral located at 3026 Grand Avenue in Dallas for $30,000.00, which represented $18,000.00 for inventory and $12,000.00 for fixtures, equipment and other property. The O. K. Super Markets' collateral located at 3805 Kiest Boulevard in Dallas was sold to Pat Hood for the same price as the above.

tion and Kimbell Foods. This agreement was the result of a meeting held on December 30, 1970, between a representative from the bank, the acting Regional Director of the Small Business Administration (hereinafter referred to as the SBA) and Mr. Harold Kindle, the President of O.K. Super Markets. This agreement allowed O.K. Super Markets to find bulk purchasers for the stores and in return the bank released the debtor to the extent of $95,000.00 owing on the $300,000.00 note. The agreement further provided that the bank would hold the total sum in escrow pending voluntary settlement or court adjudication of the claims of the SBA, Republic Bank and Kimbell Foods.

Kimbell Foods contends that its claim for $24,445.37 [2] is first and prior to the other claims of the parties herein. O.K. Super Markets executed three security agreements and financing statements in favor of Kimbell Foods to secure the payment of certain notes. The first of these agreements was executed on August 30, 1966, to secure a note in the sum of $20,000.00 and it was duly filed with the Secretary of State on September 2, 1966. The list of collateral which was attached to the agreement consisted of various types of equipment that would be needed in the operation of food stores. The agreement had a standard printed "dragnet" clause which said that the security interest in the listed collateral was also given to secure all other future advances to the debtor.[3] Subsequently, on April 17, 1968, and November 14, 1968, additional security agreements and financing statements were entered into between O.K. Super Markets and the plaintiff, securing a note in the sum of $27,000.00. These were both filed with

the Secretary of State. New collateral was listed in each of these agreements and each contained an identical future advance clause as the 1966 security agreement and financing statement. These future advance clauses are said by Kimbell Foods to encompass the later inventory purchases on open account and, therefore, the security interest in the inventory is perfected as of the first filing in 1966. No termination statements have been filed on any of these security agreements.

The United States is involved in this case due to the fact that the SBA guaranteed 90% of a $300,000.00 loan made by Republic National Bank to O.K. Super Markets on February 12, 1969. This loan was sought and was needed by O.K. Super Markets because consumer boycotts at some of their stores caused heavy losses. Prior to this loan, the bank and the SBA tried to get some of the larger creditors of O.K. Super Markets to guarantee the loan in proportion to the amount owed each creditor by O.K. Super Markets but this effort proved to be unsuccessful.

To secure this $300,000.00 note O.K. Super Markets executed a security agreement and financing statement in favor of Republic Bank, which provided that the bank would have a security interest in all of the debtor's machinery, fixtures, equipment and inventory. A financing statement had been previously filed with the Secretary of State on August 7, 1968, but the financing statement was refiled on February 18, 1969, following the making of the loan.

Even with this boost, the financial difficulties of O.K. Super Markets continued and they defaulted on the note with

---

Charles Logan bought the collateral at 1903 South Ervay in Dallas for $35,000.00, $21,000.00 being attributable to inventory and $14,000.00 for fixtures, equipment and other property.

2. On February 4, 1972, Kimbell Foods obtained a judgment against O. K. Super Markets and others in the 96th Judicial District Court of Tarrant County, Texas,

in the sum of $18,258.57 principal, $1,186.80 interest and $5,000.00 in attorney's fees.

3. The August 4, 1966 agreement provided as follows: . . . "said security interest also being given to secure the payment of all other indebtedness at any time hereafter owing by Debtor to Secured Party as well as the discharge of all obligations imposed upon Debtor hereunder."

the bank. Therefore, the United States on February 3, 1971, paid Republic National Bank 90% of the outstanding indebtedness, which totaled $252,313.93 on that date. The note and the financing statement were assigned to the SBA and the assignment was filed with Secretary of State on January 21, 1971.

When the SBA guaranteed loan was made by Republic National Bank on February 12, 1969, there was a balance owing on the April 17, 1968, note between O.K. Super Markets and Kimbell Foods in the sum of $24,893.10. This was the only outstanding note balance remaining on that date, however, there was a running balance on the open account for inventory purchases. Out of the $300,000.00 loaned to O.K. Super Markets, $24,893.10 was immediately paid to the plaintiff on February 12, 1969, thereby extinguishing the last remaining promissory note balance.

The claim of the State of Texas and the City of Dallas is principally for sales taxes that were due and payable by O.K. Super Markets when they sold the stores to Charles Logan, Pat Hood and Grand City Groceries. The State is seeking $29,887.51 in taxes, penalties and interest, and the City of Dallas claims $12,229.64. The intervenors contend that under State law they have a preferred lien which is first and prior to all others on all property purchased from O.K. Super Markets. They further contend that their liens follow the proceeds in escrow received from the sale of the stores.

Although recordation was not required until January 1, 1970, for a valid tax lien on personalty, the State did record its tax liens prior to that date. After this suit was filed, the State and City obtained a default judgment in the District Court of Travis County, Texas, on February 13, 1973, against O.K. Super Markets for past due taxes.

Aside from these sales taxes, the City of Dallas claims $2,530.10 for delinquent ad valorem personal property taxes, penalties and interest for the years 1969 through 1972. These ad valorem tax liens have not been recorded nor has a judgment been obtained thereon.

The above is a summary of the claims of each of the parties. The Court will now discuss the law applicable to this case.

■■■ The initial inquiry for this Court is whether state or federal law or a combination of both controls the disposition of these conflicting claims. Jurisdiction is based upon a federal statute, 28 U.S.C.A. § 2410, and it has long been the rule that federal law applies when a debt owing the United States is involved. *United States v. Security Trust & Savings Bank,* 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950); *Clearfield Trust Company v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *United States v. General Douglas MacArthur Sr. Vil., Inc.,* 470 F.2d 675 (2d Cir. 1972); *Texas Oil & Gas Corporation v. United States,* 466 F.2d 1040 (5th Cir. 1972); *United States v. City of Albuquerque, New Mexico,* 465 F.2d 776 (10th Cir. 1972); *United States v. Oswald and Hess Company,* 345 F.2d 886 (3d Cir. 1965); *In re Lehigh Valley Mills, Inc.,* 341 F.2d 398 (3d Cir. 1965); *W. T. Jones and Company v. Foodco Realty, Inc.,* 318 F.2d 881 (4th Cir. 1963). The reason for this rule is that the United States, in exercising its governmental functions, must be protected by a uniform federal law and should not be subjected to differing rules of the various states. *Clearfield Trust Co. v. United States,* supra. Therefore, federal law applies to a consideration of all the claims in this case, unless of course there is a federal statute directing this Court to apply state law. See Annot. 17 A.L.R.Fed. 874 (1973).

■■■ The federal rule for determining the relative priority between a federal lien and a state created lien is first in time is first in right. *United States v. New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). In applying this rule, the Supreme Court has consistently held that for a non-federal lien to

be entitled to priority it must be both earlier in time and be choate at the time the federal lien arises. *United States v. New Britain,* supra; *United States v. Waddill Company,* 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1945); *United States v. Pioneer American Ins. Company,* 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963). A non-federal lien meets the choateness test only if the identity of the lienor, the property subject to the lien, and the amount of the lien are established. *United States v. New Britain,* supra at 84, 74 S.Ct. 367; *United States v. Pioneer American Ins. Company,* supra at 89, 83 S.Ct. 1651; *United States v. General Douglas Mac-Arthur Sr. Vil., Inc.,* supra at 678. The last requirement that the amount of the lien be certain is only established if there is no further opportunity for contesting the amount of the lien. Thus, the lienor must have either obtained a judgment or the lien must be enforceable by summary proceeding. *United States v. Acri,* 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264 (1955); *United States v. Liverpool & London Ins. Company,* 348 U.S. 215, 75 S.Ct. 247, 99 L.Ed. 268 (1955); *In re Lehigh Valley Mills, Inc.,* supra. With few exceptions no common law, equitable, or statutory lien can meet the federal standard of choateness unless the lienor's claim has been reduced to judgment. Plumb, *Federal Liens and Priorities— Agenda for the Next Decade,* 77 Yale L.J. 228, 230 (1967).

It has been said that the interim steps of filing and recording a private or statutory lien, without obtaining a final judgment enforcing the lien against the property serves "merely as a caveat of a more perfect lien to come." [4] *United States v. Vorreiter,* 355 U.S. 15, 78 S.Ct. 19, 2 L.Ed.2d 23 (1957) (prior recorded mechanics' lien); *United States v. Hulley,* 358 U.S. 66, 79 S.Ct. 117, 3 L.Ed.2d 106 (1958) (prior recorded materialman's lien). Thus, in *United States v. White Bear Brewing Company,* 350 U.S.

1010, 76 S.Ct. 646, 100 L.Ed. 871 (1956), a federal tax lien was held entitled to priority over a state mechanic's lien, even though the mechanics' lien was specific under state law, it had been recorded for a certain amount, and suit had been instituted *before* the federal tax lien arose. The law that has developed around federal tax liens has been consistently applied to federal mortgage liens. *United States v. General Douglas MacArthur Sr. Vil., Inc.,* supra (HUD mortgage lien); *T. H. Rogers Lumber Company v. Apel,* 468 F.2d 14 (10th Cir. 1972) (FHA mortgage lien); *In re Lehigh Valley Mills, Inc.,* supra (SBA mortgage lien).

Further, there is authority for the proposition that a private or statutory state lien cannot be considered choate unless it has attached to certain property *by reducing it to possession* on the theory that the United States has no claim against property no longer in the possession of the debtor. *United States v. Gilbert Associates,* 345 U.S. 361, 366, 73 S.Ct. 701, 97 L.Ed. 1071 (1953); *W. T. Jones and Company v. Foodco Realty, Inc.,* supra at 887.

■■ Although a state may characterize a lien as choate and specific, this is not conclusive, and this determination is always subject to reexamination by a federal court. *United States v. New Britain,* supra; *Illinois v. Campbell,* 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946); *Texas Oil & Gas Corporation v. United States,* supra at 1050. Thus, the Fifth Circuit, in the *Texas Oil & Gas* case stated:

> ". . . . In the instant case, it is true that the bank had done all it could do under the Uniform Commercial Code to secure its interest in taxpayer debtor's accounts receivable. However, that conclusion simply does not answer the case law as it has developed in the area of tax liens. However 'complete' a lender's perfection may be under state recording laws and

---

4. Justice Cardozo first used this expression in *New York v. Maclay,* 288 U.S. 290, 294, 53 S. Ct. 323, 77 L.Ed. 754 (1933).

however 'specific' state law might deem that interest to be, it is federal law that determines the extent to which that state determination will protect a private lien from a federal tax lien." 466 F.2d at 1051.

Of course, if the state itself would characterize a lien as inchoate, then that determination would be almost conclusive. *Illinois v. Campbell*, supra.

 From these cases, it is clear that the plaintiff and the intervenors must show that their liens attached and were perfected under the law of Texas *and* were choate under federal law prior to the time the SBA lien became choate. *Texas Oil & Gas Corporation v. United States*, supra at 1052. The participation of the SBA in the Republic Bank loan was evident from the face of the note, therefore, their lien would be perfected as of the time of the February 18, 1969, filing. The SBA's claim to priority would be unaffected by the fact that formal assignment by the bank did not occur until approximately a year later. See *Director of Revenue, State of Colorado v. United States*, 392 F.2d 307 (10th Cir. 1968); *W. T. Jones and Company v. Foodco Realty, Inc.*, supra; *Texas Oil & Gas Corporation v. United States*, supra.

The continued validity of the federal choate lien test was questioned by two decisions which construed the effect of the Federal Tax Lien Act of 1966 (P.L. 89–719, 80 Stat. 1125), on federal tax and mortgage liens. See *Ault v. Harris*, 317 F.Supp. 373 (D.Alaska 1968), aff'd per curiam (by adoption) 432 F.2d 441 (9th Cir. 1970); *Connecticut Mutual Life Insurance Company v. Carter*, 446 F.2d 136 (5th Cir. 1971). In *Connecticut Mutual* an inchoate lien for attorney's fees contained in a first mortgage was entitled to priority over a FHA mortgage lien where the FHA expressly took their second mortgage subject to first mort-

gage. Over a strong dissent by Judge Rives, the Court held that:

" . . . the statute [Federal Tax Lien Act of 1966] diminishes the validity of the choate lien test in the important field of taxation where the doctrine originated. It would indeed be anomalous and contrary to our view of congressional intent to allow the FHA operating as a money-lending agency to prevail in a situation where the government as holder of a tax lien would have an inferior security interest." 446 F.2d at 139.[5]

The rationale of the *Ault* and *Connecticut Mutual* cases seems to be that since Congress chose to subordinate federal tax liens in certain specified instances that they intended to subordinate all other federal liens. However, at the same time these courts recognized that Congress had spoken only to tax liens, and other federal liens were not specifically covered by the statute.

This rationale has been questioned by two later decisions of the Second and the Tenth Circuit Courts of Appeal. In *T. H. Rogers Lumber Company v. Apel*, supra, the Court in construing the priorities between a FHA mortgage lien and mechanics' and materialman's liens stated:

"The fact that Congress chose to subordinate tax liens furnishes no evidence that it intended to subordinate all other federal liens to interests created by the laws of the individual states. The 1966 Act applied only to tax debts, and the reports of the House and the Senate speak only of subordinating federal unrecorded tax liens to mechanics' liens. There is not the slightest indication of the intent of Congress to subordinate other claims." 468 F.2d at 18.

The Second Circuit in *United States v. General Douglas MacArthur Sr. Vil.,*

5. The *Connecticut Mutual* decision prompted one District Court to remark that, "The prognosis for the choate lien test is guarded following the decision in *Connecticut Mutual Life Insurance Co. v. Carter*, . . . .." *Nova Univ. of Advanced Tech., Inc. v. Motor Vessel Gypsy*, 331 F.Supp. 721, 722 (S.D. Fla.1971).

*Inc.,* supra, also concurred with the view of the Tenth Circuit:

"We are unable to conclude, however, that a Congressional enactment, carefully drawn, which affects the priority of federal *tax* liens leaves the courts free to disregard prior precedents and thus to broadly extend the scope of the statute's principle to other unspecified areas which, though somewhat analogous, were simply not addressed by the Congress. Although Judge Weinstein's carefully considered opinion forcefully argues that such an extension represents the best balancing of competing interests, his discussion would more appropriately be addressed to Congress. But where Congress has considered proposals of a highly qualified committee and has enacted specific, carefully-tailored legislation, it would be inappropriate for a court to undertake piecemeal extensions of the principles reflected in this legislation merely because it is desirable, especially in view of the fact that Congress saw fit not to provide for these extensions. . . . In view of the national scope of the problem and the absence of legislation extending the priority of property tax liens beyond the confines of the federal tax lien, the rule of first in time, first in right, followed by the Supreme Court, must apply." 470 F.2d at 678–679.[6]

Additionally, the Fifth Circuit has now dispelled any thought that the federal choate lien test was abolished by the *Connecticut Mutual* case. In *Texas Oil & Gas Corporation v. United States,* supra, the Court stated that:

". . . It does not appear to this court that the 1966 amendments to the tax lien statutes did away with the choateness doctrine of *United States v. Security Trust,* supra. The Supreme Court expressly rejected that inference after earlier amendments to the tax lien statutes. *See*

*United States v. Pioneer American,* supra." 466 F.2d at 1053.
466 F.2d at 1053.

Therefore, this Court concludes that the federal choate lien test is still applicable to the claims of the parties herein and the *Connecticut Mutual* case is limited to the particular set of circumstances with which that Court was faced. The Court will now examine the claims of the parties with the law previously discussed as a foundation.

### Kimbell Foods

As noted previously, the plaintiff's claim is for purchases made by O.K. Super Markets for inventory sold on an open account. The claim of Kimbell Foods, and the parties have so stipulated, represents charges for goods sold to O.K. Super Markets subsequent to the date the SBA guaranteed loan was made on February 12, 1969, and the Court determines that these charges were also subsequent to the February 18th filing of the financing statement.

Although the Court has found that the SBA security interest attached and was perfected in February of 1969, this is not of primary importance in the consideration of the plaintiff's cause of action vis-à-vis that of the United States. Because even if the government lien was not choate until the filing of the assignment on January 21, 1971, the Court would still have to conclude that the claim of the United States would be prior in time. The elements for a private choate lien are that the identity of the lienor, the property subject to the lien and the *amount* of the lien be certain. As previously discussed, the last requirement is satisfied only when there is no further opportunity to judicially challenge the amount of the lien. This occurred when Kimbell Foods reduced its lien to judgment on February 4, 1972, some two years after the SBA guaranteed loan was made to O.K. Super Mar-

---

6. See also, *H. B. Agsten & Sons, Inc. v. Huntington Trust & Savings Bank,* 388 F.2d 156 (4th Cir. 1967); *Aetna Insurance Co. v. United States,* 456 F.2d 773 (Ct.Cl.1972).

kets and more than one year after the assignment was filed. Therefore, on this ground alone the claim of the United States should be entitled to priority.

However, there is another and perhaps more basic reason for the subordination of the plaintiff's claim to that of the United States. Under the choate lien test, if the State of Texas would refuse to recognize the lien as choate and valid, then that determination would be almost conclusive upon this Court. As previously stated, Kimbell Foods contends that under state law the future advance clauses found in the 1966 and 1968 security agreements and financing statements apply to and secure the purchases made by O.K. Super Markets on open account.

■■■ This Court is convinced that a Texas Court would conclude that the future advance clauses on the printed forms would not secure the later purchases on open account. Prior to the adoption of the Uniform Commercial Code, Texas courts have had occasion to construe these "dragnet clauses." The Courts stress that these provisions will apply only to future indebtedness that was clearly contemplated by the parties at the time of the making of the original agreement. When the agreement provides that the collateral secures, "all other indebtedness of any kind arising between the parties," this is construed to mean future indebtedness of the same nature as that previously described in the instrument. See *Wood v. Parker Square State Bank,* 400 S.W. 2d 898 (Tex.1966); *Moss v. Hipp,* 387 S.W.2d 656 (Tex.1965); *Finger Furniture Company v. Chase Manhattan Bank,* 413 S.W.2d 131 (Tex.Civ.App.— San Antonio, 1967, writ ref'd n.r.e.).

Section 9–204(e) of the Uniform Commercial Code, Tex.Bus. & Comm.Code Ann. § 9.204(e) (1968), allows the creation of clauses in an original security agreement that would secure future advances made to the original debtor. However, these clauses will be closely scrutinized and will be enforced only to the extent that future transactions or liabilities sought to be secured were in the clear contemplation of the parties. The reason for this rule is that this device can be abused when a lender seeks to bring in claims against the debtor that were not originally contemplated by the parties. *John Miller Supply Co., Inc. v. Western State Bank,* 10 U.C.C. Rep.Ser. 1329, 55 Wis.2d 385, 199 N.W.2d 161 (1972). The future advances must be of the same class as the primary obligation and be so related that the consent of the debtor may be inferred. 2 Gilmore, *Security Interests in Personal Property* § 35.5 (1965); *In re Eshleman,* 10 U.C.C.Rep.Ser. 750 (E.D.Pa. 1972); *John Miller Supply Co., Inc. v. Western State Bank,* supra; *National Bank of Eastern Arkansas v. Blankenship,* 177 F.Supp. 667 (E.D.Ark.1959).

■■■ The true intention of the parties is really the sole and controlling factor in determining whether the future advances were covered by the original agreement. If the parties intended to deal on a single loan basis, intending an entirely new transaction each time, then each new agreement would have to be reperfected. *John Miller Supply Co., Inc. v. Western State Bank,* supra; *In re Sanelco,* 7 U.C.C.Rep.Ser. 65 (M.D. Fla.1969); *In re Glawe,* 6 U.C.C.Rep. Ser. 876 (E.D.Wis.1969); *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.,* 3 U.C.C.Rep.Ser. 1112 (R.I. 1966).

■■■ After reviewing the facts of this case, the Court is of the opinion that it was not the intention of O.K. Super Markets and Kimbell Foods for the later purchases on open account to be secured by the future advance clauses in the 1966 and 1968 agreements. The parties treated each as a separate and distinct agreement and each was for a specific nonrecurring purpose. The 1966 agreement was entered into to enable O.K. Super Markets to expand to a new location by delaying the payment of a balance owing Kimbell Foods. This was not related in any way to the later inventory

purchases on open account by O.K. Super Markets. Likewise, the 1968 agreements were entered into for the purpose of delaying the payment of a balance owing Kimbell Foods so that O.K. Super Markets could pay off a debt owing Associated Grocers, Inc. The later purchases on open account were simply not of the same class as the primary indebtedness. As shown by the testimony of the president of O.K. Super Markets, the parties intended each transaction to be separate and distinct and each agreement was renegotiated and reperfected. It is the judgment of this Court that the parties did not intend for the "boiler plate" future advance clauses in the three agreements to secure the later purchases on open account.

For this reason, as well as the fact that the lien of the plaintiff was not choate at the time the lien of the United States arose, the Court finds that the claim asserted herein by the United States should prevail over that of Kimbell Foods.

### State and City Sales Tax Liens

Against the proceeds held in escrow, the State of Texas and City of Dallas claim certain sums for sales taxes that were due and payable by O.K. Super Markets when the three stores were sold in 1971. Although acknowledging that federal law is applicable to this case, the intervenors contend that there is a federal statute, 15 U.S.C. § 646,[7] which subordinates a SBA lien to state and city taxes that are accorded priority under state law.

▮ It is true that under the law of Texas, Article 1.07 of Title 122A, Tex. Rev.Civ.Stat.Ann., the State and City have a preferred lien for taxes, penalties and interest that is first and prior to all others. Under state law these liens attach to all the property of the debtor

and they become effective when the taxes are due and owing. *State v. Smith*, 434 S.W.2d 342 (Tex.1968); *Pecos County State Bank v. State*, 468 S.W.2d 867 (Tex.Civ.App.—Austin, 1971, writ ref'd n.r.e.).

If the intervenors are entitled to pursue the proceeds into the escrow account, and if § 646 is applicable to their claim, then it is clear that they would stand first in line. However, if § 646 is inapplicable, then under the choate lien test the intervenors would only be entitled to those taxes that became due and payable by February of 1969, when the SBA lien became choate. This is assuming of course that the intervenors are entitled to pursue the proceeds of the private sale of the three stores.

▮ The problem with the intervenors' argument as it pertains to § 646 is that the decisions construing this section have been uniform in their holdings that general taxes, such as sales taxes are not taxes due on specific property and thus do not come within the ambit of § 646. See *United States v. City of Albuquerque, New Mexico*, supra; *Director of Revenue v. United States*, supra; *United States v. Clover Spinning Mills Company*, 373 F.2d 274 (4th Cir. 1966); Annot., 17 A.L.R.Fed. 874 (1973). Even where the liens asserted are for ad valorem taxes and thus entitled to priority, the Courts have disallowed claims for penalties and interest under § 646. *United States v. Consumers Scrap Iron Corporation*, 384 F.2d 62 (6th Cir. 1967); *United States v. Christensen*, 218 F.Supp. 722 (D.Mont.1963).

▮ Aside from the questions under § 646, the government makes a strong attack on the intervenors' right to assert their liens against the proceeds held in escrow. After reviewing the applicable authorities, the Court believes that the position taken by the United States is

---

7. 15 U.S.C.A. § 646 provides as follows:
"Any interest held by the Administration in property, as security for a loan, shall be subordinate to any lien on such property for taxes due on the property to a State, or political subdivision thereof, in any case where such lien would, under applicable State law, be superior to such interest if such interest were held by any party other than the United States."

correct and finds that the intervenors are not entitled to assert their liens against the proceeds held in escrow.

As noted previously, these proceeds are from the sale of three stores, which were sold pursuant to a written agreement entered into between Republic Bank and O.K. Super Markets and approved by the United States and Kimbell Foods. It was a contract with consideration flowing both ways and it was entered into to obtain funds for the settlement of the conflicting claims of the parties to the agreement.

 Generally it may be said that a lien can follow the proceeds of the sale of property where the lien has been "destroyed" by either wrongful conversion or sale to an innocent purchaser for value. However, if the lien is not destroyed then the lienor has no right to the proceeds and the lien must follow the property. 51 Am.Jur.2d Liens § 60 (1970); 33 C.J.S. Executions § 248 (1942).

 Here, the liens held by the State and City were not extinguished or destroyed by the bulk sale of the collateral. Article 20.09 of Title 122A, Tex. Rev.Civ.Stat.Ann., provides that the purchaser of a business or stock of goods must withhold a sufficient amount of the purchase price to cover the sales taxes owed by the vendor. If he fails to withhold such an amount, he becomes personally liable. It is also clear that the lien on property purchased from O.K. Super Markets is still valid and enforceable against the property in the hands of the purchasers. See *Pecos County State Bank v. State*, supra.

 The State entered into certain releases with the purchasers of the stores. While these agreements released the purchasers from *personal liability*, they expressly provided that they did not ". . . . . release any claim or lien on any property bought from O.K. Super Markets, Inc. . . . . ." These purchasers cannot be classified as bona fide purchasers who are protected from the tax liens, because they purchased the property with full knowledge of the existence of such liens. For these reasons, the Court concludes that the intervenors are not entitled to a portion of the proceeds being held in escrow by Republic Bank for sales taxes, penalties and interest.

### Ad Valorem Taxes of the City of Dallas

The intervenor City of Dallas is asserting a claim for delinquent ad valorem personal property taxes that were owing to the City and the Dallas Independent School District for the years 1969, 1970, 1971 and 1972, when the stores were sold by O.K. Super Markets. The city seeks a total of $2,530.10 which represents $1,933.57 in delinquent taxes and $596.53 in penalties and interest.

Of course, if the intervenor is entitled to pursue the proceeds, then 15 U.S.C.A. § 646, would subordinate the claim of the United States to this ad valorem tax claim because these are taxes due on specific property. See Annot. 17 A.L.R. Fed. 874 (1973). In this regard, Chapter 19, Section 14 of the Charter of the City of Dallas gives priority to ad valorem taxes over all other claims.[8] However, the Court entertains some doubt as to whether the Dallas Independent School District would have a specific statutory lien on personal property. See *City of San Marcos v. Zimmerman*, 361 S.W.2d 929, 935 (Tex.Civ.App.—Austin, 1962, writ ref'd n.r.e.). The Court also would question whether the City of Dallas is entitled to assert a claim on behalf

8. This Charter provision provides as follows:
"A lien is hereby created on all property, personal and real in favor of the City of Dallas, for all taxes, ad valorem, occupation or otherwise. Said lien shall exist from January 1st in each year until the taxes are paid. Such lien shall be prior to all other claims, and no gift, sale, assignment or transfer of any kind, or judicial writ of any kind, can ever defeat such lien, but the director of revenue and taxation may pursue such property, and whenever found may seize and sell enough thereof to satisfy such taxes."

of a separate legal entity that is not a party to this suit.

However, it is not necessary to make these determinations because the Court feels that the City of Dallas is not entitled to pursue the proceeds in escrow. Just like the liens for sales taxes, the City's lien for ad valorem taxes was not destroyed by the bulk sale of the collateral, and the City is entitled to pursue the subject property into the hands of the purchasers. See *Pecos County State Bank v. State,* supra. Pursuant to Article 1060a, Tex.Rev.Civ. Stat.Ann., a city or school district is given the right to employ any of the previously discussed methods for the collection of taxes that are available to the State or a county. See 54 Tex.Jur. 2d Taxation § 142 n. 1. Therefore, the Court concludes that the City of Dallas is not entitled to assert the claim for ad valorem taxes against the proceeds in escrow.

### Conclusion

In summary, the Court finds that the United States is entitled to the entire sum being held in escrow by the Republic National Bank of Dallas. The United States prevails over Kimbell Foods for two reasons. In the first place, the lien asserted by the plaintiff was not sufficiently specific to satisfy the federal choate lien test until after the lien of the United States became choate. Secondly, the future advances of inventory on open account were not secured by the 1966 and 1968 security agreements. As to the tax claims of the intervenors, the Court concludes that pursuant to state statute these intervenors have full recourse against the bulk purchasers of the stores and the property purchased. Therefore, these tax liens were not destroyed by the sale of the property and the intervenors have no right to pursue the proceeds in escrow.

Judgment will be entered in accordance with the findings made herein.