557 F.2d 491
 23 UCC Rep.Serv. 177
 KIMBELL FOODS, INC., f/k/a Kimbell Milling Company, d/b/a
Kimbell Grocery Company, Plaintiffs-Appellants,
v.
REPUBLIC NATIONAL BANK OF DALLAS and United States of
America, Defendants- Appellees.
 No. 75-4105.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 12, 1977.
Rehearing and Rehearing En Banc Denied Oct. 25, 1977.
 
 A. L. Vickers, Vernon O. Teofan, Holt W. Guysi, Dallas, Tex., for plaintiffs-appellants.
 Frank J. Betancourt, Dallas, Tex., for Republic Nat'l Bank.
 Michael P. Carnes, U. S. Atty., Fort Worth, Tex., Charles D. Cabaniss, Asst. U. S. Atty., Dallas, Tex., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Texas.
 Before THORNBERRY and GEE, Circuit Judges, and MARKEY,* Chief Judge.
 GEE, Circuit Judge:
 
 
 1
 On this appeal we must decide which creditor of a mercantile chain enjoys priority to repayment from the proceeds of the sale of assets of three supermarkets, aggregating $86,672. One of these is the Small Business Administration (hereinafter SBA), an avatar of the United States, serving as the guarantor of a private loan to the debtor. SBA claims the special priority enjoyed by the sovereign in collecting taxes and the debts owed it by insolvents. We conclude that the SBA lacks priority under either state or federal law.
 
 
 2
 The other parties are the debtor, O. K. Supermarkets, Inc. (hereinafter O.K.), and a private lender, Kimbell Foods, Inc. (hereinafter Kimbell). O.K. is a Dallas supermarket chain. The bulk sale of fixtures, equipment and inventory of three of its stores forms the fund to which the parties seek priority. O.K. owed Kimbell because of weekly inventory sales to O.K. on open account. Much of the factual background from which the claims of the parties emerge is undisputed.
 
 
 3
 O.K. executed three security agreements and financing statements to Kimbell. The first was in August 1966, securing a $20,000 promissory note from Kimbell. The collateral listed included supermarket equipment and fixtures and "(a)ll goods, wares and merchandise and any and all additions or accessions thereto." In April and November of 1968, O.K. executed the remaining security agreements and financing statements to secure a $27,000 promissory note from Kimbell. The collateral for these two agreements was again specifically identified equipment normally used in a supermarket and "(a)ll goods, wares, merchandise and stock in trade and accessions." Each of the security agreements was duly filed, and no termination statement was filed on any of the agreements. It is of particular importance to this case that each of the security agreements included the provision that "said security interest also being given to secure the payment of all other indebtedness at any time hereafter owing by Debtor to Secured Party as well as the discharge of all obligations imposed upon Debtor hereunder."
 
 
 4
 On February 2, 1969, O.K. borrowed $300,000 from Republic National Bank of Dallas (hereinafter Republic). The SBA guaranteed 90% of this loan. On February 18, 1969, Republic filed with the Secretary of State of the State of Texas a security agreement and financing statement executed by O.K. to Republic granting it a security interest in all of the debtor's machinery, fixtures, equipment, inventory and all additions and accessions thereto.[1] When O.K. defaulted on this note the SBA paid Republic 90% of the outstanding indebtedness, some $252,313.93, and on January 21, 1971, Republic assigned the SBA 90% of the note and financing statement.
 
 
 5
 Events subsequent to the 1969 loan of $300,000 form perhaps the most important part of this tableau. When Republic made its loan, O.K. owed Kimbell $24,893.10 on the 1968 note for $27,000. O.K. paid off this note from the Republic loan proceeds. Thus, both the 1966 note[2] and the 1968 note between O.K. and Kimbell had been satisfied. O.K. still, however, owed Kimbell $18,390.93 on open account for inventory purchases. After February 12, 1969, O.K. paid Kimbell $18,390.93 against that debt payments Kimbell credited to O.K.'s oldest outstanding balances. O.K. kept on making inventory purchases from Kimbell on open account until January 15, 1971. By then the balance of O.K.'s account with Kimbell was $18,258.57. On January 15, 1971, Kimbell filed suit in Texas courts to recover that amount and, on January 31, 1972, obtained a judgment for $24,445.37 $18,258.57 principal, $1,186.80 interest and $5,000 attorneys' fees.
 
 
 6
 Both the SBA and Kimbell claimed priority in the $86,672 proceeds of the sale of three O.K. Supermarkets. After hearing the evidence and considering the stipulations of the parties the court ruled that the SBA had priority superior to all inchoate liens by virtue of its special status as a federal lien creditor. The district court ruled Kimbell's lien inchoate because Kimbell had not reduced its lien to judgment before the SBA guaranteed Republic's note or before the SBA made good on its guarantee. The court went on to rule that Kimbell did not have a good security interest in the goods sold at bulk sale, a fact that certainly rendered its lien inchoate. Kimbell appeals.
 
 Kimbell's Lien
 
 7
 We must first determine whether the district court properly held that Kimbell's security agreements securing the 1966 and 1968 notes did not cover the advances Kimbell made to O.K. on open account.[3] The security agreements provide that the security interest also secures the payment of future indebtedness between the parties. Texas law countenances such so-called "dragnet clauses." See Tex.Bus. & Com.Code § 9.204(e) (Tex.U.C.C.).[4] Acknowledging this apparent approval of future advance clauses, the district court ruled that the future advance clause did not operate in this case. It relied on pre-Code Texas cases and U.C.C. cases from other jurisdictions to restrict the application of the future advance clause to future debts clearly contemplated by the parties. So reasoning, it ruled that in this case the parties meant the security agreements to cover only the notes for which they were executed, not later purchases on open account. We view the transactions differently.[5]
 
 
 8
 Although the district court correctly stated the law of Texas, it arrived at the wrong conclusion in light of Texas' application of its law. Texas courts do not recognize the application of a future advance clause unless the future advance to be secured was "reasonably within the contemplation of the parties to the mortgage at the time it was made." Wood v. Parker Square State Bank, 400 S.W.2d 898, 901 (Tex.1966). See also Moss v. Hipp, 387 S.W.2d 656 (Tex.1965); Wallenstein & St. Claire, Annual Survey of Texas Law Property, 30 Southwestern L.J. 28, 53 n. 214 (1976).[6] Consistent with this view, in Texas a future advance clause in a mortgage does not secure a subsequent debt from the debtor to a third party acquired from the third party by the mortgagee. See Wood, supra. In circumstances similar to those at bar, however, Texas courts have hinted that future advance clauses will be effective. In Wood, for example, the Texas Supreme Court remarked that:
 
 
 9
 The more reasonable construction of this general language (a future advance clause) is that it referred to obligations directly arising between Lincoln Enterprises (the original debtor) and respondent bank (the original lender), i. e., where Lincoln became obligated to the bank as the maker of an obligation, or became liable in a secondary capacity in favor of the bank.
 
 
 10
 Supra at 902. See also Estes v. Republic National Bank, 462 S.W.2d 273 (Tex.1970); Wallenstein & St. Claire, supra at 53 n.214. In light of this evidence we conclude that in Texas a further extension of credit to the debtor by the lender is deemed future indebtedness reasonably contemplated by the parties when they execute a future advance clause.
 
 
 11
 The district court concluded that the parties did not intend the future advance clause to cover purchases on open account because the security agreements were intended to cover only the amounts loaned under a promissory note. In reaching this conclusion, however, the district court ignored two important factors: the parol evidence rule and Texas' treatment of future advance clauses in analogous situations. The district court admitted testimony by Harold Kindle, the president of O.K., about the subjective intention of the parties when they executed the 1966 and 1968 notes, security agreements and financing statements. Although his testimony was equivocal,[7] the district court understood him to say that the parties intended each transaction to be separate and distinct. Admission of such testimony was error. The language of the contract, unless ambiguous, represents the intention of the parties. The intent deduced from this objective matter, not the parties' subjective understandings, is controlling. See Western Oil Fields, Inc. v. Pennzoil United, Inc., 421 F.2d 387, 390 (5th Cir. 1970); City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968); Wall v. Lower Colorado River Authority, 536 S.W.2d 688, 691 (Tex.Civ.App. Austin 1976, writ ref'd n. r. e.). See also First National Bank v. Rozelle, 493 F.2d 1196, 1201 (10th Cir. 1974). Testimony as to O.K.'s subjective intent in receiving the future advance clause was a classic violation of the parol evidence rule and clearly inadmissible.
 
 
 12
 The district court compounded this error by failing to consider the truest test of the parties' intention, the words of the contract clearly providing that the security agreement should cover future indebtedness. In Estes v. Republic National Bank, 462 S.W.2d 273 (Tex.1970), the Texas Supreme Court upheld the applicability of a future advance clause despite the debtor's claim of an oral agreement that the deed of trust containing the future advance clause was intended as a separate transaction not to extend to other indebtedness between the parties. In the absence of some evidence that the "dragnet clause" was placed in the contract by mutual mistake, the court found that the clause clearly and unequivocally stated the intention of the parties for the land to secure the debtor's other loans from the bank. See also Wood, supra. In light of the Estes and Wood cases, the district court improperly discarded these future advance clauses.
 
 
 13
 The district court also relied on the circumstances surrounding the 1966 and 1968 loans in finding that the parties treated each loan as a separate and distinct agreement for a specific, nonrecurring purpose and to determine that the later inventory purchases were unrelated. Examining the documents and the circumstances surrounding their execution, we find nothing that negates the parties' statement that the security agreements cover the inventory purchases on account.
 
 
 14
 The 1966 promissory note was entered into to free O.K.'s current cash flow to purchase fixtures for a new store and to allow O.K. to buy opening inventory from Kimbell on credit. At least in part, then, the 1966 security agreement contemplated the purchase of inventory on credit. The security agreement states that it is given "to secure an advance of goods, wares and merchandise and does not include a preexisting debt." Under these circumstances we cannot say that later inventory purchases on credit by O.K. were "unrelated" to the 1966 security agreement or involved future advances "not of the same class" so as to negate the applicability of the future advance clause, as the district court held. See 401 F.Supp. at 325-26.
 
 
 15
 Again in 1968, O.K.'s promissory note allowed it to delay payment on its open-account purchases so as to free current cash flow to pay off a debt owed Associated Grocers, Inc. The 1968 security agreement and financing statements were again related to Kimbell's inventory advances on open account to O.K.[8] Although the notes, security agreements and financing statements were executed in response to special factual circumstances, those circumstances are not necessarily inconsistent with giving the future advance clauses in those agreements their plain meaning, see First National Bank v. Rozelle, supra at 1201, holding that Kimbell's 1966 and 1968 security agreements and financing statements covered its later advances of inventory to O.K. on open account.
 
 Priority Under State Law
 
 16
 We now consider whether Kimbell had priority under state law. If it did not, we need not consider the more pressing questions of the applicability of federal law and the relative priority of federal liens. See United States v. P. S. Hotel Corp., 527 F.2d 500, 501 (8th Cir. 1975). As the assignee of Republic's 1969 note and security agreement, the SBA may assert whatever priority that note might command under state law. The district court did not directly address the question of Republic's priority qua noteholder because of its view that Kimbell's security agreements with O.K. did not secure future advances. We find that they did, but even so the security agreement of February 18, 1969, between Republic and O.K. might be thought prior for two reasons. First, Republic may have established a security interest superior to that of Kimbell. Second, the 1969 note might be thought prior to secured future advances made after February 18, 1969. After reviewing the Texas law, we conclude that neither of these theories accords the SBA, standing in the shoes of Republic, priority in the proceeds from the bulk sale.
 
 
 17
 Republic could obtain a superior security interest in the collateral, notwithstanding Kimbell's previously filed security agreement, if Republic attained a purchase money security interest in the collateral. The Uniform Commercial Code, adopted in Texas, provides that a purchase-money security interest in collateral except inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is properly perfected. Tex.Bus. & Com.Code § 9.314(d) (1968) (Tex.U.C.C.). Unfortunately for Republic and the SBA, the record reflects no purchase of goods by O.K. with the proceeds of the $300,000 note that could give rise to a purchase-money security interest in any items sold at the bulk sale except inventory.
 
 
 18
 O.K. used some of the funds from the $300,000 note to purchase inventory. Texas law affords Republic a purchase-money security interest in that inventory and grants Republic priority: if the security interest was perfected at the time the debtor received possession; if the holder of the purchase-money security interest notified the holders of prior security interests before the debtor received possession of the collateral; and if that notice stated that the person giving notice had or expected to acquire a purchase-money security interest in the specifically described goods. Tex.Bus. & Com.Code § 9.312(c) (1968) (Tex.U.C.C.). Republic did not give the required notice to Kimbell so as to establish priority in the inventory. See Borg Warner Acceptance Corp. v. Wolfe City National Bank, 544 S.W.2d 947, 951 (Tex.Civ.App. Dallas 1976, no writ). Kimbell was vaguely aware that Republic was planning to loan O.K. funds and would expect to acquire a lien, but Republic never gave Kimbell the notification requisite for priority under the Code. Republic never notified Kimbell that it expected to acquire a lien on the inventory, nor did it describe the inventory by item or type. Republic thus forfeited whatever priority it could have attained. Republic had priority, therefore, only if its lien was prior in time to Kimbell's.
 
 
 19
 Here we again inquire into the nature of the future advance clause and the security interest it creates, a particularly important endeavor when, as here, the inquiry determines the status of the lien of an intervening secured creditor. The Texas U.C.C. provides in § 9.312(e)(1) that the first filed of conflicting security interests perfected by filing prevails. Tex.Bus. & Com.Code § 9.312(e)(1) (1968) (Tex.U.C.C.). In this case both Kimbell's and Republic's security interests were perfected by filing; Kimbell would normally have priority unless the future advance did not qualify because of the creation of an intervening security interest. The circumstance of a future advance after an intervening filed security interest does not alter the scheme, however. When both interests are filed security interests, we interpret section 9.312(e) of the U.C.C. to adopt the relation-back position so that the first-to-file rule awards priority even to an advance made after an intervening security interest. See Tex.Bus. & Com.Code § 9.312(e)(1) and Example 4 (1968) (Tex.U.C.C.); Cohen, The Future Advance Interest Under the Uniform Commercial Code: Validity and Priority, 10 B.C.Ind. & Com.L.Rev. 1, 13 (1968); Comment, Priority of Future Advances Lending Under the Uniform Commercial Code, 35 U.Chi.L.Rev. 128, 133-34 (1967). The 1972 amendments to the U.C.C., adopted by Texas in 1973, effective in 1974, explicitly adopted the relation-back position for future advances. See Tex.Bus. & Com.Code § 9.312(g) (Supp.1976) (Tex.U.C.C.). Although no Texas cases confirmed the prior U.C.C. provisions' adoption of the relation-back doctrine, the doctrine was consistently upheld in pre-Code Texas cases involving future advances. See Freiberg v. Magale, 70 Tex. 116, 7 S.W. 684, 685 (1888); Crabb v. William Cameron & Co., 63 S.W.2d 367, 368 (Tex.Com.App.1933, judgm't adopted); Coke Lumber & Mfg. Co. v. First National Bank, 529 S.W.2d 612, 615 (Tex.Civ.App. Dallas 1975, writ ref'd). See also Wallenstein & St. Claire, supra at 53-54 n.214. Under Texas law, Kimbell retained a superior lien to Republic, and the SBA, as Republic's assignee, held an inferior state lien.
 
 Priority Under Federal Law
 
 20
 The SBA asserts that, despite its poor showing under state law, under federal law it has a claim superior to Kimbell's.[9] The SBA asserts the federal common law priority rule of "first in time, first in right" and the peculiar patina that federal courts have placed on that rule specifying that only "choate" nonfederal liens may qualify as "first in time." We conclude that the "choateness" rule of federal common law does not apply here.
 
 
 21
 Understanding the SBA's argument requires a review of the development of the federal common law of priority. The source of much of federal priority law is the congressional declaration awarding the United States priority for the payment of its debts from certain insolvents.[10] In 31 U.S.C. § 191 (1970) (or Revised Statutes § 3466 as it is more commonly known), Congress requires that in settling the affairs of certain insolvents "the debts due to the United States shall be first satisfied." Section 3466 had been read as only granting the United States, as an unsecured creditor, a priority against other unsecured creditors, see Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905, 909-11 (1954), thus recognizing the integrity of pre-existing liens. But in Spokane County v. United States, 279 U.S. 80, 49 S.Ct. 321, 73 L.Ed. 621 (1929), the Supreme Court concluded that the priority granted the United States would defer only to specific and perfected ("choate") liens prior in time. 279 U.S. at 93-95, 49 S.Ct. 321. To further protect the United States' priority under section 3466, the Supreme Court ruled that whether a lien was choate involved a matter of federal law, see United States v. Waddill, Holland & Flinn, Inc., 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1945), thus preventing states from divesting the United States of priority by adopting their own definitions of what constituted a choate state lien. Later the Supreme Court narrowly defined what could qualify as a choate lien,[11] effectively assuring absolute priority to United States claims under section 3466. See Plumb, Federal Liens and Priorities Agenda for the Next Decade, 77 Yale L.J. 228, 230 (1967); Kennedy, From Spokane County to Vermont: The Campaign of the Federal Government Against the Inchoate Lien, 50 Iowa L.Rev. 724, 736 (1965); Burroughs, The Choate Lien Doctrine, 1963 Duke L.J. 449, 452. See generally, Lacy, Effect of Federal Priority and Tax Lien Legislation on Creditors of Vendors and Purchasers, 50 Ore.L.Rev. 621, 625-31 (1971). Our case does not require the application of section 3466, since O.K. is not an insolvent, but the SBA invokes the choateness doctrine spawned by section 3466 to claim priority.
 
 
 22
 The SBA bases its argument on judicial extension of the choateness doctrine to determine priority for other federal liens. Although the federal tax statute accorded the United States a lien for taxes only making no mention of priority for federal tax liens, see 26 U.S.C. § 6321 (1970) in United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950), the Supreme Court held that the choateness principles of section 3466 were equally applicable when a federal tax lien was competing for priority with a state lien. The purpose of the tax lien statute was to assure prompt and certain collection of taxes from tax delinquents; this purpose required a rule similar to that prevailing with collections under section 3466. 340 U.S. at 51, 71 S.Ct. 111. Other federal courts, without questioning whether the reasons for extending the choateness doctrine of section 3466 to tax liens justified its extension to other liens, have applied the doctrine to bestow overriding priority on other federal liens. See, e. g., T. H. Rogers Lumber Co. v. Apel, 468 F.2d 14 (10th Cir. 1972) (FHA mortgage lien); United States v. Oswald & Hess Co., 345 F.2d 886 (3d Cir. 1965) (SBA mortgage lien); In re Lehigh Valley Mills, Inc., 341 F.2d 398 (3d Cir. 1965) (SBA security interest). See also, Plumb, Federal Liens & Priorities Agenda for the Next Decade, 77 Yale L.J. 228, 286-87 (1967). The SBA asks us to accord it this superior status in this ordinary commercial transaction far removed from the doctrine's origins by arguing that the choateness doctrine is an inevitable consequence of applying federal law; but as our study reveals, the choateness concept is a judicial creation distinguishable from the well-recognized federal rule of "first in time, first in right." See Texas Oil & Gas Corp. v. United States, 466 F.2d 1040, 1045 (5th Cir. 1972); Plumb, supra at 230. History in this area does not permit us to enshrine without analysis the status sought by the SBA. Viewing the choateness doctrine independently, strong policy reasons militate against its application in this context.
 
 
 23
 First, the interests supporting the Supreme Court's extension of section 3466's criteria to tax liens in Security Trust do not support a similar extension to liens arising from SBA garden-variety commercial loans or guaranties. The choateness doctrine reflects a judicial recognition of the self-preservation prerogative of the sovereign. Taxes are its lifeblood, and the choateness doctrine recognizes and protects that vital flow. Delinquent taxes make the United States an involuntary creditor of the taxpayer, often ranged against other substantial commercial creditors and state tax creditors. By the time the United States becomes aware of its status and files its tax lien, it may well absent self-help find itself standing at the end of the state priority line. The Supreme Court's extension of the choateness doctrine protected the collection of taxes and gave the United States, a sovereign, a measure of relief from its involuntary-creditor status. When the United States, however, in its less-exalted capacity as SBA, serves as a surrogate commercial lender or guarantor, it enters the commercial credit scheme voluntarily. These circumstances afford it an opportunity to evaluate the credit risks, to examine the interests of other creditors, and to exact such security as the circumstances and policy of the program dictate. See Plumb, The Relative Priority of Federal and Business Claims: Yesterday, Today and Tomorrow, 27 Bus.Lawyer 1195, 1217 (1972); Comment, The Priority of Federal Claims: Selected Problems and Theoretical Considerations, 24 Case W.L.Rev. 521, 534-35 (1973); Comment, The Relative Priority of SBA Liens: An Unreasonable Extension of the Federal Preference, 64 Mich.L.Rev. 1107, 1128-29 (1966). As a quasi-commercial lender, SBA (U.S.A.) does not require, and should not be accorded, the special priority which it compels as sovereign, so long as it complies with Congress' admonition that it make loans which are "of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(7) (1970). See Comment, The Relative Priority of SBA Liens: An Unreasonable Extension of the Federal Preference, supra at 1119.
 
 
 24
 Second, in a related concern, the importance of taxes to the functioning of government merits the extraordinary priority accorded them by the judge-made "choateness" doctrine. The Supreme Court has long recognized that section 3466 is informed by the importance of securing adequate revenue to sustain the public burdens and discharge the public debts. See United States v. Moore, 423 U.S. 77, 81-82, 96 S.Ct. 310, 46 L.Ed.2d 219 (1975); United States v. Emory, 314 U.S. 423, 426, 62 S.Ct. 317, 86 L.Ed. 315 (1943); United States v. State Bank of North Carolina, 6 Pet. 29, 35, 8 L.Ed. 308, 310 (1832). Consequently it has transferred that respect for revenue-protecting measures to the tax-lien statute. See Security Trust, supra. On the other hand, the SBA program is a supplement to commercial loan operations, certainly less central to the proper functioning of the national government and less deserving of the extraordinary priority accorded by the choateness doctrine.
 
 
 25
 Third, granting the SBA an exceptional priority pursuant to the choateness doctrine is inconsistent with the congressional declaration of policy pursuant to its establishment of the SBA. In 15 U.S.C. § 631 (1970), Congress declares that the purpose of the SBA assistance program is "to assist in the establishment, preservation, and strengthening of small business concerns . . . ." If the SBA may belatedly buy into loans and so assert liens superior to those of prior secured creditors, every sane potential creditor of small business will shun potential debtors of the SBA as anathema or extract promises that the debtor will not seek SBA assistance. What secured creditor will extend credit on collateral that may only serve to increase the security of a future SBA loan? Such a legal posture scarcely assures a steady flow of capital into necessitous small business.
 
 
 26
 Finally, logical symmetry urges rejection of the SBA's effort to extend the choateness doctrine to this context. The primary thrust of the SBA's argument is that because section 3466's choateness doctrine was extended to tax liens it should be extended to SBA contractual liens. Yet in the Federal Tax Lien Act of 1966 Congress substantially pared the applicability of the choateness doctrine by recognizing that certain state lien interests, including security interests, could attain priority over tax liens. See 26 U.S.C. § 6323 (1970). See generally, Coogan, The Effect of the Federal Tax Lien Act of 1966 Upon Security Interests Created Under the Uniform Commercial Code, 81 Harv.L.Rev. 1369 (1968). Why should the choateness doctrine bestow priority on an SBA contractual lien when a United States tax lien, more in need of the protection of the choateness doctrine, commands no such priority? Connecticut Mutual Life Ins. Co. v. Carter, 446 F.2d 136, 139 (5th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); Ault v. Harris, 317 F.Supp. 373, 375 (D. Alaska), aff'd and opinion adopted, 432 F.2d 441 (9th Cir. 1970). See Note, 3 Rutgers Camden L.Rev. 592, 597 (1972).[12] In the absence of any congressional directive to extend the choateness doctrine[13] and in our role as judicial custodians of the doctrine, we decline to extend it further in this Circuit.
 
 
 27
 The SBA argues that circuit courts have already concluded that the choateness doctrine applies to mortgage liens, so it should apply here in the virtually identical situation of a federal contractual lien competing against state liens. It is true that a number of courts, including ours, have concluded that the federal "first in time, first in right" approach to priority applies to federal mortgage liens. See United States v. Roessling, 280 F.2d 933 (5th Cir. 1960) (mortgage lien under Emergency Relief Appropriation Act of 1935); United States v. General Douglas MacArthur Senior Village, 470 F.2d 675 (2d Cir. 1972) (HUD mortgage lien); Director of Revenue v. United States, 392 F.2d 307 (10th Cir. 1968) (SBA mortgage lien); United States v. County of Iowa, 295 F.2d 257 (7th Cir. 1961) (Reconstruction Finance Corp. mortgage lien); Southwest Engine Co. v. United States, 275 F.2d 106 (10th Cir. 1960) (SBA chattel mortgage lien). Those cases are not necessarily authority for adoption of the choateness doctrine here, however, for in each case the application of the "first in time, first in right" doctrine, without using the concept of choateness, could have given priority to the federal liens because each competing state lien arose after the federal lien. See Roessling,supra at 935; General Douglas MacArthur Senior Village, supra at 677; Director of Revenue, supra at 313; County of Iowa, supra at 257-58; Southwest Engine Co., supra at 107. See also, Plumb, Federal Tax Liens & Priorities Agenda for the Next Decade, 77 Yale L.J. 228, 287 n. 368 (1967); Comment, The Relative Priority of SBA Liens: An Unreasonable Extension of the Federal Preference, 64 Mich.L.Rev. 1107, 1128 (1966). Only the Third Circuit has applied the choateness doctrine to give priority to federal contractual liens when an unvarnished "first in time, first in right" approach would have given priority to the state claims. See United States v. Oswald & Hess Co.,345 F.2d 886 (3d Cir. 1965) (SBA mortgage lien); In re Lehigh Valley Mills, Inc., 341 F.2d 398 (3d Cir. 1965) (SBA mortgage lien). But there the Third Circuit assumed without analysis that "choateness" was part and parcel of the federal law. Our examination of the history of the choateness doctrine and the policy arguments against its extension to circumstances when the United States acts as lender persuade us to reject the Third Circuit's approach and hold that the choateness doctrine does not apply to give priority to the SBA's contractual lien in the absence of insolvency.[14]
 
 
 28
 Despite our decision that the choateness doctrine alone does not give the SBA priority, the question the choateness doctrine addresses still remains: how does a federal court determine when a state lien has arisen so that it may decide whether the state or the federal lien is "first in time?" Whatever the answer to that question may be in other contexts,[15] in the context of competing state security interests arising under the U.C.C., we conclude that liens perfected under the UCC qualify to compete against federal liens under the federal "first in time, first in right" priority rules.[16] The UCC carefully prescribes the steps necessary to perfect a security interest. Perfection under the UCC provides many of the assurances of the existence of a lien required by the choateness doctrine identity of the debtor, identity of the lienholder, and identity of the property serving as collateral. Further, the UCC embodies rules of nationwide applicability all states but Louisiana have adopted it assuring that federal contractual liens will not be subject to the idiosyncracies of particular state laws. Cf. First National Bank v. SBA, 429 F.2d 280, 286 (5th Cir. 1970). The context provides our final reason: perfection under the UCC provides protection to the secured creditor against later-filed claims of other creditors; in the absence of congressional mandate or persuasive policy reasons to the contrary, it should similarly protect secured creditors against later arising federal contractual liens.
 
 
 29
 Even given our conclusions that the choateness doctrine does not apply here and that perfection under the UCC will qualify a lien as "first in time," Kimbell must still establish that its lien was "first in time" under federal law. Its task is complicated because, although Kimbell had a perfected lien on the collateral, the indebtedness the lien secured results from future advances made after Republic made its loan to O.K. When the SBA bought into Republic's loan in 1971, it bought Republic's lien and for purposes of federal priority under "first in time, first in right," the SBA's lien "attached" when Republic's lien arose in 1969. See United States v. Eklund, 369 F.Supp. 1052, 1054-55 (S.D.Ill.1972). Under Texas law, as we have seen, the lien securing future advances dates from Kimbell's prior security interest. Does Kimbell's lien retain that date under federal common law and thus remain prior in time to the Republic-SBA lien?
 
 
 30
 Perhaps because of the pervasiveness of the choateness doctrine, we have found no federal case discussing the substantive content of the "first in time, first in right" rule with regard to future advances. Faced with the necessity of fashioning a federal common-law rule because of congressional silence on the subject, see Clearfield Trust Co. v. United States, 318 U.S. 363, 376, 63 S.Ct. 573, 87 L.Ed. 838 (1943), we grapple with the problem by first examining the approach taken by the states.
 
 
 31
 Prior to the Uniform Commercial Code, the states adopted diverse rules on whether an optional (as opposed to an obligatory) future advance would relate back to take priority from the date of the original security agreement. The majority rule was that optional advances made before the advancing creditor received actual notice of an intervening lien related back to the date of the original security interest. See Cohen, The Future Advance Interest Under the UCC: Validity & Priority, 10 B.C.Ind. & Comm.L.Rev. 1, 12 (1968); 59 C.J.S. Mortgages § 230(1) (1949); 55 Am.Jur.2d Mortgages § 352 (1971). A minority of jurisdictions adopted what was known as the Michigan rule in which, although the prior lien was effective to secure the future advance, the lien was effective only from the date the future advance was made. Intervening encumbrances took priority over subsequent future advances. Cohen, supra at 12-13. Another minority view, based on older English precedent, held that optional future advances related back regardless of actual notice of intervening liens "for it was the Folly of the second Mortgagee, with Notice, to take such security." Gordon v. Graham, 22 Eng.Rep. 502, 2 Eq.Ca.Abr. 598 (1716). See Cohen, supra at 11. As we have seen, the ubiquitous U.C.C., at least with respect to competing security interests perfected by filing, adopted the third rule. See, e. g., Tex.Bus. & Com.Code § 9.312(e)(1) (1968) (Tex.U.C.C.).
 
 
 32
 Our brief survey of American jurisprudence evidences at least this: the trend of thought in American law rejects the Michigan rule and allows future advances secured by an earlier security agreement to take priority from the date of the earlier security agreement under some circumstances. We believe that federal common law should recognize this legal principle.[17] Cf. United States v. State of Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941) (inchoate tax lien that became choate after United States purchased property gave due notice of liability and, when amount of tax was certain, related back to day lien imposed). Given that, however, we need go no further in crafting federal common law for this case[18] because under either the actual notice rule or the U.C.C. rule Kimbell's lien related back to its prior security agreement and was prior in time to the SBA's lien.
 
 
 33
 Kimbell's future advances relate back to and have the priority of its original security agreements with O.K. because at the time of the future advances Kimbell had no notice of the SBA's lien. Thus, under the stricter "actual notice" rule for relation back, Kimbell had no notice of the SBA's intervening interest. It is true that Kimbell was aware of Republic's lien and so the record suggests the SBA's guaranty of the loan the lien secured.[19] Yet under Texas law the U.C.C. this notice could not affect Kimbell's decision whether to advance funds because under state law its advances were secured by and took the priority of the 1966 and 1968 security agreements. It was only when the SBA bought into the note in February 1971 that Kimbell could have actual notice of the existence of a federal lien and the application of federal law. At oral argument the United States conceded that before it bought into Republic's note it had no lien. Without actual notice of another lien that could supersede the priority of its future advances under state law, Kimbell's advancements are secured by and take the priority of the 1966 and 1968 security agreements.
 
 
 34
 In summary, the SBA's purchase of 90% of Republic's loan to O.K. vested it with Republic's lien, and, in measuring priority under federal law, the SBA's lien attached when Republic's lien arose in 1969. All of Kimbell's future advances were made subsequent to Republic's loan, but the future advances are secured by the 1966 and 1968 security agreements and take priority from those dates. Thus, Kimbell's lien for inventory advances is prior in time to the SBA's lien, and Kimbell has priority in the proceeds from the sale of the three O.K. Supermarkets.
 
 
 35
 REVERSED.
 
 
 
 *
 Of United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Republic had previously filed a financing statement on August 7, 1968, covering the same collateral but refiled the statement on February 18, 1969. The district court apparently considered only the February 18 filing effective, see 401 F.Supp. at 323, as do we
 
 
 [2]
 The record is unclear on the disposition of the 1966 note. We may assume that it was satisfied because the parties stipulated that on February 12, 1969, the 1968 note was the only outstanding promissory note between O.K. and Kimbell
 
 
 [3]
 Kimbell contends this question is not before the court because of stipulations in the pretrial order of the parties, who stipulated the existence of the 1966 and 1968 loans, security agreements and financing statements. Nowhere in the stipulations did the parties agree that the security agreements secured Kimbell's advances to O.K. of inventory on open account. Nor was the question explicitly listed as one of the contested issues of law in the pretrial order. The question was raised implicitly, however, in contested issues of fact and law concerning the understanding of Republic as to the priority of its lien, the effect of O.K.'s payoff of the 1968 note, and the effect of O.K.'s payments to Kimbell of amounts greater than the balance on open account outstanding just prior to Republic's 1969 loan to Kimbell. We think the question was before the court
 
 
 [4]
 Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment
 Tex.Bus. & Com.Code § 9.204(e) (1968) (Tex.U.C.C.). The Texas Business and Commerce Code, containing Texas' version of the U.C.C., was amended in 1973. The amendments changed portions of the U.C.C. relevant to this case, but those changes did not become effective until January 1, 1974. Unless otherwise noted, we rely on the Texas U.C.C. as it existed at the time of the relevant events in this case.
 
 
 [5]
 The interpretation of a contract is a question of law, so we are not restricted by the clearly erroneous rule of Fed.R.Civ.P. 52(a). See Backar v. Western States Producing Co., 547 F.2d 876, 880 (5th Cir. 1977); First Nat'l Bank v. Ins. Co. of North America, 495 F.2d 519, 522 (5th Cir. 1974)
 
 
 [6]
 In the absence of Texas cases dealing with future advance clauses under the Code, we, like the district court, have drawn upon Texas' treatment of future advance clauses in other instruments. Because the Texas U.C.C. gives no indication that future advance clauses are to be treated differently today than under Texas pre-Code law, we consider the pre-Code cases dealing with other types of security interests authoritative
 
 
 [7]
 Indeed, well-nigh incoherent. When asked whether O.K. intended that the security agreements cover all other advances and open accounts between it and Kimbell, Kindle answered:
 Well, I considered the 1966 agreement a thing of the past from the 1968 agreement. I felt like it was, you know, a new beginning and since we intended to pay the full amount I realize it was a demand note and they could demand it at any time they wanted to, but we had had a good relationship so it was of no real concern. I didn't stop and ponder about, well, should I do this or should we do this, O.K. Supermarkets.
 When asked again, Kindle responded:
 There again, there was not any specific instruction on this question I mean about which agreement would cover which. I felt like we signed a new statement in '68, and everything that had transpired in the past was history. I felt like that any monies expended on either one of those without an abrupt halt and then a start over again would be that '66 would be history now and then when the '68 was paid off, it would be history as well.
 
 
 [8]
 O.K.'s failure to demand a termination statement under Tex.Bus. & Com.Code § 9.404(a) (1968) (Tex.U.C.C.) after paying off the 1968 note also tends to discredit the claim that the security agreements applied only to the 1966 and 1968 notes
 
 
 [9]
 We have recently ruled that federal law controls the rights and duties of the United States when it operates the SBA loan program. United States v. Terrey, 554 F.2d 685 (5th Cir. 1977). See Miree v. DeKalb County, --- U.S. ----, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). One matter in the record suggests that this principle may not apply. The February 18, 1969, security agreement between Republic and O.K. provided that "This agreement shall be construed according to the laws of the State of Texas." The agreement bound the parties' assigns to this provision; thus, the SBA was bound to the application of Texas law in its pursuit of its rights against O.K. See United States v. Whitehouse Plastics, 501 F.2d 692, 694 n. 1 (5th Cir. 1974). Cf. United States v. Terrey, 554 F.2d 685 (5th Cir. 1977). But see United States v. Outriggers, Inc., 549 F.2d 337, 340 n. 5 (5th Cir. 1977) (SBA regulation requires application of federal law to SBA documents). Nevertheless, we cannot read the language in the security agreement as waiving the SBA's right to have federal law applied in evaluating the priority of its interest against those of third parties
 
 
 [10]
 Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed
 31 U.S.C. § 191 (1970). Although our present concept of governmental priority developed as an intrinsic privilege of the English crown, the United States' priority derives solely from statute. See United States v. Vermont, 377 U.S. 351, 358, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1965); United States v. New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954).
 
 
 [11]
 To assure that his lien was choate, the private lien holder must establish the identity of the lienor, the property subject to the lien, and the fixed amount of the lien. See, e. g., United States v. New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1953); United States v. Pioneer American Ins. Co., 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963). Because the amount of the lien was not fixed until the lienor had exhausted his opportunities to challenge the amount, the Court indicated that only possession or reduction to judgment would meet the last criterion. See, e. g., United States v. Gilbert Associates, Inc., 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953). See also Texas Oil & Gas Corp. v. United States, 466 F.2d 1040, 1044-45 (5th Cir. 1972)
 
 
 [12]
 The district court distinguished Connecticut Mutual's analogy to the 1966 Tax Lien Act by relying on cases in other circuits and a subsequent case in our circuit reaffirming the existence of the choateness doctrine. 401 F.Supp. at 323-24. In Texas Oil & Gas Corp. v. United States, 466 F.2d 1040 (5th Cir. 1972), we utilized the choateness doctrine to adjudge whether a state lien fitted the priority provisions of the 1966 Tax Lien Act. This action is not inconsistent with our refusal to extend the choateness doctrine to SBA security interests because previous case law had established the applicability of the choateness doctrine to statutorily-created federal tax liens. The 1966 Tax Lien Act adjusted the application of the doctrine by recognizing the priority of certain state interests, essentially granting exceptions to the choateness doctrine. In this area of SBA contractual liens, the choateness doctrine has not been established as a concomitant to the application of the federal "first in time, first in right" rule. We consider the 1966 Tax Lien Act as neither affirming nor denying the applicability of the choateness doctrine to other federal liens, but the Act's recognition that some state claims should have priority over federal tax liens is a strong policy argument against extending the choateness doctrine to deny priority to state claims. Accordingly, the decisions of other circuit courts that deny that the 1966 Tax Lien Act was intended to subordinate other federal liens are consistent with our approach. See T. H. Rogers Lumber Co. v. Apel, 468 F.2d 14 (10th Cir. 1972); United States v. General Douglas MacArthur Senior Village, Inc., 470 F.2d 675 (2d Cir. 1972). We differ with those courts because, unlike them, we do not consider the choateness doctrine a necessary companion to the federal "first in time, first in right" priority scheme
 
 
 [13]
 In 15 U.S.C. § 646 (1970), Congress subordinates SBA interests in property to state property taxes:
 Any interest held by the Administration in property, as security for a loan, shall be subordinate to any lien on such property for taxes due on the property to a state, a political subdivision thereof, in any case when such lien would, under applicable state law, be superior to such interest if such interest were held by any party other than the United States.
 This statute could be read as ameliorating the impact of the choateness doctrine by waiving the immunity it would grant, thus implicitly recognizing the applicability of the choateness doctrine to SBA liens. We have read the enactment less broadly, noting that the purpose of § 646 is to waive the extraordinary priority of § 3466, 31 U.S.C. § 191 (1970). See City of Sherman v. United States, 400 F.2d 373, 377 (5th Cir. 1968). By giving SBA liens the same status as state liens with regard to state tax claims, the provision also has the effect of waiving the "first in time, first in right" principle to recognize the state's grant of priority to later liens for state and local taxes. See Edmondson v. Chesapeke Clamchip Corp., 350 F.Supp. 1236, 1239 (D.Md.1972). In light of these purposes we detect no implicit congressional recognition of and reaction to the general application of the choateness doctrine.
 
 
 [14]
 Even if we did apply the choateness doctrine to this claim, it is not certain that the SBA's lien would prevail. To be choate, the identity of the lienor, the property subject to the lien, and the amount of the lien must be established. See note 10, supra. For state liens competing with federal tax liens or liens with § 3466 priority, the last requirement meant that the lienor must have either obtained a judgment or the lien must have been enforceable by summary proceeding. See United States v. Acri, 348 U.S. 211, 214, 75 S.Ct. 239, 99 L.Ed. 264 (1955); United States v. Liverpool & London & Globe Ins. Co., 348 U.S. 215, 217, 75 S.Ct. 244, 99 L.Ed. 268 (1955). Under these criteria, federal liens with § 3466 priority are virtually invulnerable to state claims. Kennedy, From Spokane County to Vermont: The Campaign of the Federal Government Against the Inchoate Lien, 50 Iowa L.Rev. 724, 736 (1965). The Supreme Court intimated prior to the 1966 Tax Lien Act, however, that the choateness criteria might be more easily satisfied by state liens competing against federal tax liens because Congress had not provided priority for tax liens. See United States v. Vermont, 377 U.S. 351, 385, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964); Crest Finance Co. v. United States, 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342 (1961); Texas Oil & Gas Corp. v. United States, 466 F.2d 1040, 1045-46 (5th Cir. 1972). See also Coogan, The Effect of the Federal Tax Lien Act of 1966 Upon Security Interests Created Under the Uniform Commercial Code, 81 Harv.L.Rev. 1369, 1378-79 (1968); Kennedy, supra at 737; Burroughs, supra at 465-69. Similarly, Congress has not provided priority for SBA liens in noninsolvency cases: relaxation of the stringent choateness requirements also appears proper. Further, the same reasons that argue against the extension of the choateness doctrine to federal contractual liens would urge us to adopt a less stringent standard of choateness in this context
 Thus, Kimbell's lien could qualify as "choate." The 1966 and 1968 security agreements and financing statements provided the identity of the lienor and the property subject to the lien. Although Kimbell had not fixed the amount of its lien by reducing it to judgment before the SBA lien arose on January 21, 1971, see infra, it had terminated extensions of credit so that its accounts reflected the final amount of the claim secured by its security agreements with O.K. This could suffice to meet relaxed criteria applied to liens competing with federal contractual liens. Cf. Crest Finance Co., supra (creditor secured by assignment of accounts receivable with perfected lien under state law had choate lien as against federal tax lien). See also Burroughs, supra at 470.
 
 
 [15]
 Other types of state liens for taxes, for mechanics and materialmen, or for certain types of secured loans present problems that we leave for another day. First, the manner of perfection of those liens is diverse creating havoc with a nationwide program and may not provide notice sufficient for federal entities to ascertain their existence before granting loans. Second, consideration of these loans for qualification under the federal "first in time, first in right" rule is complicated by the fact that several states, including Texas, either provide special priority for the liens, see, e. g., Tex.Tax. Gen.Ann. art. 1.07(1) (1969) (preferred lien for state and city taxes), or allow subsequently perfected liens to relate back to the date the debt was incurred. See, e. g., Tex.Rev.Civ.Stat.Ann. art. 5459 § 2(a) (Supp.1976) (mechanic's liens have priority from date construction commences)
 
 
 [16]
 In reaching our conclusion we do not apply state law for we have previously concluded that federal law controls here but we rather adopt portions of state law in order to fashion a proper federal rule. See United States v. Terrey, 554 F.2d 685, 692 (5th Cir. 1977); Ault v. Harris, 317 F.Supp. 373, 376 (D. Alaska), aff'd and opinion adopted, 432 F.2d 441 (9th Cir. 1970)
 
 
 [17]
 The existence of various legal rules on future advances reflects the underlying conceptual problem of future advances. One view is that a security interest that provides for optional future advances creates a single lien when the interest is perfected. Further future advances may increase the amount that the lien secured, but the security interest itself is one and indivisible. A second view is that a security interest for optional future advances may complete most of the requisites of perfection and give notice of possible future advances but that a future advance under the agreement takes a discrete lien dating from the day of the advance. Comment, Priority of Future Advances Lending Under the Uniform Commercial Code, 35 U.Chi.L.Rev. 128, 136-38 (1967). The original U.C.C. weighed heavily in favor of the single interest theory, see, e. g., Tex.Bus. & Com.Code § 9.312(e)(1) & Example 4 (1968) (Tex.U.C.C.), and the 1972 amendments endorse the single interest theory more strongly. See, e. g., Tex.Bus. & Com.Code § 9.312(g) (Supp.1976) (Tex.U.C.C.)
 
 
 [18]
 Strong policy arguments favoring greater protection for the SBA counsel adoption of the actual notice rule while equally strong considerations similar to the ones that argue against the choateness rule urge adoption of the U.C.C. rule. We reserve the final resolution of this difficult decision for another day
 
 
 [19]
 Kimbell's awareness of the SBA's guaranty did not suffice as actual notice that the SBA had a lien. At oral argument the United States admitted that it had no lien until Republic assigned its lien on January 21, 1971
 See Lakeshore Apartments, Inc. v. United States, 351 F.2d 349, 353 (9th Cir. 1965); City of New York v. United States, 414 F.Supp. 90, 92 (E.D.N.H.1975). Cf. United States v. Marxen, 307 U.S. 200, 205, 59 S.Ct. 811, 83 L.Ed. 1222 (1939) (United States as guarantor not a creditor in bankruptcy when note assigned it after petition filed); In re Miller, 105 F.2d 926, 928-29 (2d Cir. 1939).