# UNITED STATES *v.* KIMBELL FOODS, INC., ET AL.

No. 77–1359.   Argued January 8, 1979—Decided April 2, 1979*

---

*Together with No. 77–1644, *United States* v. *Crittenden, dba Crittenden Tractor Co.*, also on certiorari to the same court.

716

Marshall, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Barnett* argued the cause for the United States in both cases. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock, Deputy Solicitor General Easterbrook, Marion L. Jetton,* and *Thomas G. Wilson.*

*Vernon O. Teofan* argued the cause for respondents in No. 77–1359. With him on the brief was *A. L. Vickers.*

*Howell Hollis III* argued the cause and filed a brief for respondent in No. 77–1644.†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

We granted certiorari in these cases to determine whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities.[1]  To resolve this question, we must decide first whether federal or state law governs the controversies; and second, if federal law applies, whether this Court should fashion a uniform priority rule or incorporate state commercial law.  We conclude that the source of law is federal, but that a national rule is unnecessary to protect the federal interests underlying the loan programs.  Accordingly, we adopt state law as the appropriate federal rule for establishing the relative priority of these competing federal and private liens.

## I

## A

No. 77–1359 involves two contractual security interests in the personal property of O. K. Super Markets, Inc.  Both interests were perfected pursuant to Texas' Uniform Commercial Code (UCC).[2]  The United States' lien secures a loan guaranteed by the Small Business Administration (SBA).  The private lien, which arises from security agreements that preceded the federal guarantee, secures advances respondent made after the federal guarantee.

In 1968, O. K. Super Markets borrowed $27,000 from

---

†*Robert D. McLean* filed a brief for the National Commercial Finance Conference, Inc., as *amicus curiae* in No. 77–1359.

*James D. Keast* and *William J. Travis* filed a brief for the National Farm & Power Equipment Dealer's Assn. as *amicus curiae* urging affirmance in No. 77–1644.

[1] 436 U. S. 903 (1978); 439 U. S. 817 (1978).

[2] Tex. Bus. & Com. Code Ann. § 9.101 *et seq.* (1968).

Kimbell Foods, Inc. (Kimbell), a grocery wholesaler. Two security agreements identified the supermarket's equipment and merchandise as collateral. The agreements also contained a standard "dragnet" clause providing that this collateral would secure future advances from Kimbell to O. K. Super Markets. Kimbell properly perfected its security interests by filing financing statements with the Texas Secretary of State according to Texas law.

In February 1969, O. K. Super Markets obtained a $300,000 loan from Republic National Bank of Dallas (Republic). The bank accepted as security the same property specified in Kimbell's 1968 agreements, and filed a financing statement with the Texas Secretary of State to perfect its security interest. The SBA guaranteed 90% of this loan under the Small Business Act, which authorizes such assistance [3] but, with one exception, does not specify priority rules to govern the SBA's security interests.[4]

O. K. Super Markets used the Republic loan proceeds to satisfy the remainder of the 1968 obligation and to discharge an indebtedness for inventory purchased from Kimbell on open account. Kimbell continued credit sales to O. K. Super Markets until the balance due reached $18,258.57 on January 15, 1971. Thereupon, Kimbell initiated state proceedings against O. K. Super Markets to recover this inventory debt.

Shortly before Kimbell filed suit, O. K. Super Markets had defaulted on the SBA-guaranteed loan. Republic assigned its security interest to the SBA in late December 1970, and recorded the assignment with Texas authorities on January 21, 1971. The United States then honored its guarantee and paid

---

[3] Section 7 (a) of the Small Business Act, 72 Stat. 387, as amended, 15 U. S. C. § 636 (a)(1), permits extension of financial assistance to small businesses when funds are "not otherwise available on reasonable terms from non-Federal sources." The SBA prefers to guarantee private loans rather than to disburse funds directly. § 636 (a)(2); 13 CFR §§ 120.2 (b)(1), 122.15 (c) (1978).

[4] See n. 36, infra.

Republic $252,331.93 (90% of the outstanding indebtedness) on February 3, 1971. That same day, O. K. Super Markets, with the approval of its creditors, sold its equipment and inventory and placed the proceeds in escrow pending resolution of the competing claims to the funds. Approximately one year later, the state court entered judgment against O. K. Super Markets, and awarded Kimbell $24,445.37, representing the inventory debt, plus interest and attorney's fees.

Kimbell thereafter brought the instant action to foreclose on its lien, claiming that its security interest in the escrow fund was superior to the SBA's.[5] The District Court held for the Government. On determining that federal law controlled the controversy, the court applied principles developed by this Court to afford federal statutory tax liens special priority over state and private liens where the governing statute does not specify priorities. *Kimbell Foods, Inc.* v. *Republic Nat. Bank of Dallas,* 401 F. Supp. 316, 321–322 (ND Tex. 1975). See, *e. g., United States* v. *Security Trust & Sav. Bank,* 340 U. S. 47 (1950); *United States* v. *Pioneer American Ins. Co.,* 374 U. S. 84 (1963).[6] Under these rules, the lien "first in time" is "first in right."[7] However, to be

---

[5] Jurisdiction was premised on 28 U. S. C. § 2410.

[6] The tax liens were authorized by 26 U. S. C. § 3670 (1952 ed.), currently codified at 26 U. S. C. § 6321. This statute established the time when the tax lien arose, 26 U. S. C. § 3671 (1952 ed.), currently codified at 26 U. S. C. § 6322, and required the filing of notice for the lien to be valid against specified creditors. 26 U. S. C. § 3672 (1952 ed.), currently codified, as amended, at 26 U. S. C. § 6323 (a). But until 1966, the statute did not specify priority rules to resolve conflicts between federal tax liens and rival liens. The Federal Tax Lien Act of 1966, 80 Stat. 1125, as amended, 26 U. S. C. §§ 6323 (b), (c), (d), (e), set specific priorities to displace the doctrines that this Court had created. See *infra,* at 738.

[7] This well-accepted common-law principle for resolving lien priority disputes, see *Rankin* v. *Scott,* 12 Wheat. 177, 179 (1827); *United States* v. *New Britain,* 347 U. S. 81, 85–86 (1954), also underlies the Uniform Commercial Code's priority structure. See Uniform Commercial Code § 9–312 (5), 3 U. L. A. 85 (1979 pamphlet) (hereinafter Model UCC); J. White & R. Summers, Uniform Commercial Code 905 (1972).

considered first in time, the nonfederal lien must be "choate," that is, sufficiently specific, when the federal lien arises.[8]   A state-created lien is not choate until the "identity of the lienor, the property subject to the lien, and the amount of the lien are established." *United States* v. *New Britain,* 347 U. S. 81, 84 (1954); see *United States* v. *Vermont,* 377 U. S. 351, 358 (1964).   Failure to meet any one of these conditions forecloses priority over the federal lien, even if under state law the nonfederal lien was enforceable for all purposes when the federal lien arose.

Because Kimbell did not reduce its lien to judgment until February 1972, and the federal lien had been created either in 1969, when Republic filed its financing statement, or in 1971, when Republic recorded its assignment, the District

---

[8] See, *e. g., United States* v. *Security Trust & Sav. Bank,* 340 U. S. 47 (1950); *United States* v. *New Britain, supra,* at 86; *United States* v. *Acri,* 348 U. S. 211, 213 (1955); *United States* v. *R. F. Ball Construction Co.,* 355 U. S. 587 (1958) (*per curiam*); *United States* v. *Pioneer American Ins. Co.,* 374 U. S. 84 (1963); *United States* v. *Vermont,* 377 U. S. 351, 355 (1964); *United States* v. *Equitable Life Assurance Soc.,* 384 U. S. 323, 327–328 (1966).

This Court originally formulated the choate lien test to govern conflicts arising under the federal insolvency statute, Rev. Stat. § 3466, 31 U. S. C. § 191, which awards the United States priority over other creditors in collecting debts from insolvents.   In theory, the statute does not defeat liens that are choate at the time of insolvency.   But in practice, it has proved difficult for nonfederal lienors to satisfy the strictures of the choateness test.   See *New York* v. *Maclay,* 288 U. S. 290 (1933); *United States* v. *Texas,* 314 U. S. 480 (1941); *United States* v. *Waddill, Holland & Flinn, Inc.,* 323 U. S. 353 (1945); *United States* v. *Gilbert Associates, Inc.,* 345 U. S. 361 (1953).

The Court later applied the choateness doctrine outside the insolvency context together with the first-in-time requirement to give federal tax liens special priority.   See *United States* v. *Security Trust & Sav. Bank, supra,* at 51.   For a discussion of the history of the choate lien test, see Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L. J. 905 (1954) (hereinafter Kennedy, Relative Priority).

Court concluded that respondent's lien was inchoate when the federal lien arose. 401 F. Supp., at 324–325. Alternatively, the court held that even under state law, the SBA lien was superior to Kimbell's claim because the future advance clauses in the 1968 agreements were not intended to secure the debts arising from O. K. Super Market's subsequent inventory purchases. *Id.*, at 325–326.

The Court of Appeals reversed. *Kimbell Foods, Inc.* v. *Republic Nat. Bank of Dallas,* 557 F. 2d 491 (CA5 1977). It agreed that federal law governs the rights of the United States under its SBA loan program, *id.*, at 498 n. 9, 503 n. 16, and that the "first in time, first in right" priority principle should control the competing claims. *Id.*, at 502–503. However, the court refused to extend the choateness rule to situations in which the Federal Government was not an involuntary creditor of tax delinquents, but rather a voluntary commercial lender. *Id.*, at 498, 500–502. Instead, it fashioned a new federal rule for determining which lien was first in time, and concluded that "in the context of competing state security interests arising under the U. C. C.," the first to meet UCC perfection requirements achieved priority. *Id.*, at 503.[9]

The Court of Appeals then considered which lien qualified as first perfected. Disagreeing with the District Court, the court determined that, under Texas law, the 1968 security agreements covered Kimbell's future advances, and that the liens securing those advances dated from the filing of the security agreements before the federal lien arose. *Id.*, at 494–498, 503. But the Court of Appeals did not adopt Texas law. Rather, it proceeded to decide whether the future advances should receive the same treatment under federal com-

---

[9] In so holding, the Court of Appeals refused to formulate a federal doctrine of general applicability, "leav[ing] for another day" questions involving the priority of other nonfederal liens, such as state tax and mechanic's liens. 557 F. 2d, at 503 n. 15.

mon law.   After surveying three possible approaches,[10] the court held that Kimbell's future advances dated back to the 1968 agreements, and therefore took precedence over Republic's 1969 loan.   *Id.*, at 503–505.

## B

At issue in No. 77–1644 is whether a federal contractual security interest in a tractor is superior to a subsequent repairman's lien in the same property.   From 1970 to 1972, Ralph Bridges obtained several loans from the Farmers Home Administration (FHA), under the Consolidated Farmers Home Administration Act of 1961.[11]   Like the Small Business Act, this statute does not establish rules of priority.   To secure the FHA loans, the agency obtained a security interest in Bridges' crops and farm equipment, which it perfected by filing a standard FHA financing statement with Georgia officials on February 2, 1972.   Bridges subsequently took his tractor to respondent Crittenden for repairs on numerous occasions, accumulating unpaid repair bills of over $1,600.   On December 21, 1973, Bridges again had respondent repair the tractor, at a cost of $543.81.   When Bridges could not pay the balance of $2,151.28, respondent retained the tractor and acquired a lien therein under Georgia law.   Ga. Code § 67–2003 (1978).

---

[10] One approach afforded priority to liens intervening between execution of a security agreement covering future advances and extension of those advances.   Another gave priority only to future advances made before the advancing creditor received actual notice of an intervening lien, while a third rule afforded priority regardless of actual notice.   The court rejected the first option and found that Kimbell would prevail under either of the other two since it did not have notice of the SBA guarantee: *Id.*, at 503–504.

[11] The statute, now redesignated the Consolidated Farm and Rural Development Act, see 86 Stat. 657, authorizes federal financial assistance for farmers who are "unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms." 75 Stat. 307, as amended, 7 U. S. C. § 1922 (1976 ed., Supp. III).

On May 1, 1975, after Bridges had filed for bankruptcy and had been discharged from his debts,[12] the United States instituted this action against Crittenden to obtain possession of the tractor.[13] The District Court rejected the Government's claim that the FHA's security interest was superior to respondent's, and granted summary judgment for respondent on alternative grounds. First, it held that the agency had not properly perfected its security interest because the financing statement inadequately described the collateral. Civ. Action No. 75–37–COL (MD Ga. Sept. 25, 1975). Second, it found that even if the description were sufficient, both federal and state law accorded priority to respondent's lien. *Ibid.*

The Court of Appeals affirmed in part and reversed in part. It first ruled that "the rights and liabilities of the parties to a suit arising from FHA loan transactions must, under the rationale of the *Clearfield Trust* doctrine, be determined with reference to federal law." 563 F. 2d 678, 680–681 (CA5 1977) (footnotes omitted). See *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943). In fashioning a federal rule for assessing the sufficiency of the FHA's financing statement, the court elected to follow the Model UCC rather than to incorporate Georgia law. 563 F. 2d, at 681–682. And, it determined that the description of the collateral was adequate under the Model UCC to perfect the FHA's security interest. *Id.,* at 682–683.

The Court of Appeals then addressed the priority question and concluded that neither state law nor the first-in-time, first-in-right and choateness doctrines were appropriate to resolve the conflicting claims. *Id.,* at 683–689. In their place, the court devised a special "federal commercial law rule," using

[12] Bridges' bankruptcy did not affect the relative priority of the Government and respondent. The priority rights afforded the United States under § 64a of the Bankruptcy Act do not defeat valid pre-existing liens. See 11 U. S. C. § 104 (a); 3A W. Collier, Bankruptcy § 64.02 [2] (14th ed. 1975).

[13] Jurisdiction was invoked under 28 U. S. C. § 1345.

the Model UCC and the Tax Lien Act of 1966 as guides.  *Id.,* at 679, 688–690.[14]  This rule would give priority to repairman's liens over the Government's previously perfected consensual security interests when the repairman continuously possesses the property from the time his lien arises.  *Id.,* at 690–691.[15]  Applying its rule, the Court of Appeals concluded that Crittenden's lien for only the final $543.81 repair bill took precedence over the FHA's security interest.  *Id.,* at 692.[16]

---

[14] Section 9–310 of the Model UCC provides:

"When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise." Model UCC § 9–310 (1979 pamphlet).

The Tax Lien Act of 1966 extends similar protection to repairmen:

"Even though notice of a [federal tax lien] has been filed, such lien shall not be valid

.        .        .        .        .

"With respect to tangible personal property subject to a lien under local law securing the reasonable price of the repair or improvement of such property, as against a holder of such a lien, if such holder is, and has been, continuously in possession of such property from the time such lien arose." 26 U. S. C. § 6323 (b) (5).

[15] The court found it unnecessary to determine whether the same result would obtain under Georgia's Commercial Code.  563 F. 2d, at 688 n. 17, 689.

[16] Other Courts of Appeals have adopted divergent approaches regarding the priority of federal security interests arising from loan programs.  Compare, *e. g., Chicago Title Ins. Co.* v. *Sherred Village Associates,* 568 F. 2d 217 (CA1 1978), cert. pending, No. 77–1611; *United States* v. *General Douglas MacArthur Senior Village, Inc.,* 470 F. 2d 675 (CA2 1972), cert. denied *sub nom. County of Nassau* v. *United States,* 412 U. S. 922 (1973); *United States* v. *Oswald & Hess Co.,* 345 F. 2d 886 (CA3 1965); *Willow Creek Lumber Co.* v. *Porter County Plumbing & Heating, Inc.,* 572 F. 2d 588 (CA7 1978); *United States* v. *Latrobe Construction Co.,* 246 F. 2d 357 (CA8), cert. denied, 355 U. S. 890 (1957); *T. H. Rogers Lumber Co.* v. *Apel,* 468 F. 2d 14 (CA10 1972), with, *e. g., United States* v. *Gregory-Beaumont Equipment Co.,* 243 F. 2d 591 (CA8 1957); *United States* v.

## II

This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs. As the Court explained in *Clearfield Trust Co.* v. *United States, supra,* at 366–367:

"When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. . . . The authority [to do so] had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws [of any State]. The duties imposed upon the United States and the rights acquired by it . . . find their roots in the same federal sources. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." (Citations and footnote omitted.)

Guided by these principles, we think it clear that the priority of liens stemming from federal lending programs must be determined with reference to federal law. The SBA and FHA unquestionably perform federal functions within the meaning of *Clearfield.* Since the agencies derive their authority to effectuate loan transactions from specific Acts of Congress passed in the exercise of a "constitutional function or power," *Clearfield Trust Co.* v. *United States, supra,* at 366, their rights, as well, should derive from a federal source.[17] When

---

*California-Oregon Plywood, Inc.,* 527 F. 2d 687 (CA9 1975). See also *United States* v. *Union Livestock Sales Co.,* 298 F. 2d 755 (CA4 1962); *United States* v. *Kramel,* 234 F. 2d 577 (CA8 1956); *United States* v. *Chappell Livestock Auction, Inc.,* 523 F. 2d 840 (CA8 1975); *Bumb* v. *United States,* 276 F. 2d 729 (CA9 1960).

[17] See *United States* v. *Standard Oil Co.,* 332 U. S. 301, 305–306 (1947); *United States* v. *Seckinger,* 397 U. S. 203, 209–210 (1970); Friendly, In Praise of *Erie*—And of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 410 (1964); see also *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173, 176 (1942); *Board of County Comm'rs* v. *United States,* 308 U. S. 343, 349–350 (1939).

Government activities "aris[e] from and bea[r] heavily upon a federal . . . program," the Constitution and Acts of Congress " 'require' otherwise than that state law govern of its own force." *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 592, 593 (1973).[18] In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law.[19]

That the statutes authorizing these federal lending programs do not specify the appropriate rule of decision in no way limits the reach of federal law. It is precisely when Congress has not spoken " 'in an area comprising issues substantially related to an established program of government operation,' " *id.,* at 593, quoting Mishkin 800, that *Clearfield* directs federal courts to fill the interstices of federal legislation "according to their own standards." *Clearfield Trust Co.* v. *United States,* 318 U. S., at 367.[20]

Federal law therefore controls the Government's priority rights. The more difficult task, to which we turn, is giving content to this federal rule.

## III

Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably

---

[18] See *United States* v. *Security Trust & Sav. Bank,* 340 U. S., at 49; cf. *United States* v. *Yazell,* 382 U. S. 341, 356 (1966).

[19] See *United States* v. *Standard Oil Co., supra,* at 305–307; Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U. Pa. L. Rev. 797, 800, and n. 15 (1957) (hereinafter Mishkin); Comment, Adopting State Law as the Federal Rule of Decision: A Proposed Test, 43 U. Chi. L. Rev. 823, 825 (1976); see also *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell,* 352 U. S. 29, 33–34 (1956); *Miree* v. *DeKalb County,* 433 U. S. 25, 29, 31–32 (1977).

[20] See *Board of County Comm'rs* v. *United States, supra,* at 349–350; *National Metropolitan Bank* v. *United States,* 323 U. S. 454, 456 (1945); *Holmberg* v. *Armbrecht,* 327 U. S. 392, 395 (1946); *Moor* v. *County of Alameda,* 411 U. S. 693, 701–702, and n. 12 (1973).

require resort to uniform federal rules. See *Clearfield Trust Co.* v. *United States, supra,* at 367; *United States* v. *Little Lake Misere Land Co., supra,* at 594–595. Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *United States* v. *Standard Oil Co.,* 332 U. S. 301, 310 (1947).[21]

Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules. *United States* v. *Yazell,* 382 U. S. 341, 354 (1966); see *Clearfield Trust Co.* v. *United States, supra,* at 367; *United States* v. *Standard Oil Co., supra,* at 311; *Illinois* v. *Milwaukee,* 406 U. S. 91, 105 n. 6 (1972). Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision.[22] Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests.[23] Finally, our choice-of-

---

[21] As explained by one commentator:

"Whether state law is to be incorporated as a matter of federal common law . . . involves the . . . problem of the relationship of a particular issue to a going federal program. The question of judicial incorporation can only arise in an area which is sufficiently close to a national operation to establish competence in the federal courts to choose the governing law, and yet not so close as clearly to require the application of a single nationwide rule of substance." Mishkin 805.

[22] *Miree* v. *DeKalb County, supra,* at 28–29; see *RFC* v. *Beaver County,* 328 U. S. 204, 209–210 (1946); *United States* v. *Brosnan,* 363 U. S. 237, 241–242 (1960); *United States* v. *Yazell, supra,* at 356–357; *Auto·Workers* v. *Hoosier Cardinal Corp.,* 383 U. S. 696, 701–703 (1966).

[23] See *United States* v. *Allegheny County,* 322 U. S. 174, 183 (1944); *RFC* v. *Beaver County, supra,* at 209–210; *Auto Workers* v. *Hoosier Cardinal Corp , supra,* at 706–707; *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63, 68 (1966); *United States* v. *Little Lake Misere Land Co.,* 412

law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.[24]

The Government argues that effective administration of its lending programs requires uniform federal rules of priority. It contends further that resort to any rules other than first in time, first in right and choateness would conflict with protectionist fiscal policies underlying the programs. We are unpersuaded that, in the circumstances presented here, nationwide standards favoring claims of the United States are necessary to ease program administration or to safeguard the Federal Treasury from defaulting debtors. Because the state commercial codes "furnish convenient solutions in no way inconsistent with adequate protection of the federal interest[s]," *United States* v. *Standard Oil Co., supra,* at 309, we decline to override intricate state laws of general applicability on which private creditors base their daily commercial transactions.

## A

Incorporating state law to determine the rights of the United States as against private creditors would in no way hinder administration of the SBA and FHA loan programs. In *United States* v. *Yazell, supra,* this Court rejected the argument, similar to the Government's here, that a need for uniformity precluded application of state coverture rules to an SBA loan contract. Because SBA operations were "specifically and in great detail adapted to state law," 382 U. S., at 357, the federal interest in supplanting "important

U. S. 580, 595–597 (1973); *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 465–466 (1975); *Miree* v. *DeKalb County, supra,* at 31–32; *Robertson* v. *Wegmann,* 436 U. S. 584, 590–593 (1978); see also *De Sylva* v. *Ballentine,* 351 U. S. 570, 581 (1956).

[24] See *United States* v. *Brosnan, supra,* at 241–242; *United States* v. *Yazell, supra,* at 352–353; *Wallis* v. *Pan American Petroleum Corp., supra,* at 68; *United States* v. *Little Lake Misere Land Co., supra,* at 599–603.

and carefully evolved state arrangements designed to serve multiple purposes" was minimal. *Id.,* at 353. Our conclusion that compliance with state law would produce no hardship on the agency was also based on the SBA's practice of "individually negotiat[ing] in painfully particularized detail" each loan transaction. *Id.,* at 345–346. These observations apply with equal force here and compel us again to reject generalized pleas for uniformity as substitutes for concrete evidence that adopting state law would adversely affect administration of the federal programs.

Although the SBA Financial Assistance Manual on which this Court relied in *Yazell* is no longer "replete with admonitions to follow state law carefully," *id.,* at 357 n. 35, SBA employees are still instructed to, and indeed do, follow state law.[25] In fact, a fair reading of the SBA Financial Assistance Manual, SOP 50–10 (SBA Manual), indicates that the agency assumes its security interests are controlled to a large extent by the commercial law of each State.[26] Similarly, FHA reg-

---

[25] The applicable regulations recognize that "[i]n order to implement and facilitate th[e] Federal loan programs," SBA offices should comply with state law, in particular, with state procedural requirements for obtaining enforceable security interests. 13 CFR § 101.1 (d)(3) (1978). And the SBA routinely follows such rules, Tr. of Oral Arg. in No. 77–1359, p. 43, as it did here by requiring Republic to file a financing statement and a notice of assignment. That the SBA conforms its transactions to state law is also reflected in the security agreement between Republic and O. K. Super Markets, approved by the SBA, which provided that the contract would be construed according to Texas law and bound the parties' assigns to this provision. App. in No. 77–1359, p. 68.

[26] For example, the Manual stresses that the borrower's inventory should be used as collateral only after careful consideration of the protection afforded under state law:

*"Uniform Commercial Code—Factor's Lien Laws.* Most states have adopted the Uniform Commercial Code or Factor's Lien Laws. Under such laws it is possible to obtain a general lien covering all existing and to-be-acquired inventory. Generally, these statutes also provide that the lien may follow the accounts receivable or proceeds resulting from the sale of the inventory. . . . The loan specialist should inquire as to any

ulations expressly incorporate state law.  They mandate compliance with state procedures for perfecting and maintaining valid security interests, and highlight those rules that differ from State to State.  *E. g.,* 7 CFR §§ 1921.104 (c)(1), 1921.105, 1921.106, 1921.107, 1921.108, 1921.111, 1930.5, 1930.8, 1930.9, 1930.14, 1930.17, 1930.27 (1978).[27]  To ensure that employees are aware of new developments, the FHA also issues "State supplements" to "reflect any State statutory changes in its version of the UCC." § 1921.111 (c); see, *e. g.,* §§ 1802.80, 1904.108 (d), 1930.46 (d)(3).  Contrary to the Government's claim that the FHA complies only with state procedural rules, Reply Brief for United States in No. 77-1644, p. 7, the agency's reliance on state law extends to substantive requirements as well.  Indeed, applicable regula-

---

prior liens against either inventories or receivables.  The lien obtained under the Code (or Factor's Lien Laws) covering accounts receivable or other proceeds resulting from the sale of the inventory is not generally invalidated by the fact that the borrower thereafter deals with the accounts receivable or proceeds as his own. . . .  However, a careful study should be made of borrower's credit circumstances to determine the measures of control and supervision to be imposed. . . .  Although the collateral may not require close supervision from inception, the security agreement should contain provisions that borrower shall . . . comply with such other servicing practices as are deemed necessary by counsel to safeguard the collateral.

"Accounts receivable resulting from the sale of inventories assigned to SBA prior to adoption of the Code in code states shall be serviced in accordance with applicable local law existing prior to the date of adoption of the Code.  This is not necessary however, if in the opinion of counsel, servicing can be performed in a manner permitted under the Code without adversely affecting SBA's interest." SBA Manual ¶ 29 (a)(4)(b) (1977). See also n. 25, *supra.*

[27] After publication of the 1978 Code of Federal Regulations, the FHA began reorganizing its regulations to provide separate rules for each loan program.  Most provisions of 7 CFR cited throughout this opinion have been recodified with modifications not relevant here.  See, *e. g.,* 43 Fed. Reg. 5504, 7978, 23986, 55882–55895, 56643–56647, 59078 (1978); 44 Fed. Reg. 1701, 4431–4458, 6354, 10979–10980 (1979).  For convenience, we refer to the 1978 version of the FHA regulations contained in 7 CFR.

tions suggest that state rules determine the priority of FHA liens when federal statutes or agency regulations are not controlling. 7 CFR §§ 1872.2 (c), 1921.111 (b), 1930.43, 1930.44, 1930.46 (d)(1), (3) (1978); see also § 1955.15 (d).

Thus, the agencies' own operating practices belie their assertion that a federal rule of priority is needed to avoid the administrative burdens created by disparate state commercial rules.[28] The programs already conform to each State's commercial standards. By using local lending offices and employees who are familiar with the law of their respective localities,[29] the agencies function effectively without uniform procedures and legal rules.

Nevertheless, the Government maintains that requiring the agencies to assess security arrangements under local law would dictate close scrutiny of each transaction and thereby impede expeditious processing of loans. We disagree. Choosing responsible debtors necessarily requires individualized selection procedures, which the agencies have already implemented in considerable detail. Each applicant's financial condition is evaluated under rigorous standards in a lengthy process.[30] Agency employees negotiate personally with borrowers, investigate property offered as collateral for encumbrances, and

---

[28] The differences between the rules, moreover, are insignificant in comparison with the similarities. All States except Louisiana have enacted Art. 9 of the UCC with minor variations. See Model UCC 1-2 (1979 pamphlet). As Judge Friendly observed in *United States* v. *Wagematic Corp.,* 360 F. 2d 674, 676 (CA2 1966):

"When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States."

[29] See 13 CFR §§ 101.3, 101.7 (a) (1978); 7 CFR §§ 1800.1–1800.4 (1978).

[30] See 13 CFR §§ 120.2 (c), (d), as amended, 43 Fed. Reg. 3702 (1978); 13 CFR §§ 122.15, 122.16 (1978); SBA Manual ¶¶ 10, 11, 16–40; 7 CFR §§ 1801.2–1801.4, 1904.108, 1904.127, 1904.175, 1980.175 (1978).

obtain local legal advice on the adequacy of proposed security arrangements.[31]   In addition, they adapt the terms of every loan to the parties' needs and capabilities.[32]   Because each application currently receives individual scrutiny, the agencies can readily adjust loan transactions to reflect state priority rules, just as they consider other factual and legal matters before disbursing Government funds.   As we noted in *United States* v. *Yazell,* 382 U. S., at 348, these lending programs are distinguishable from "nationwide act[s] of the Federal Government, emanating in a single form from a single source." (Footnote omitted.)   Since there is no indication that variant state priority schemes would burden current methods of loan processing, we conclude that considerations of administrative convenience do not warrant adoption of a uniform federal law.

B

The Government argues that applying state law to these lending programs would undermine its ability to recover funds disbursed and therefore would conflict with program objectives.   In the Government's view, it is difficult "to identify a material distinction between a dollar received from the collection of taxes and a dollar returned to the Treasury on

---

[31] See *United States* v. *Yazell,* 382 U. S., at 344–346; 13 CFR §§ 101.2–1, 101.7 (a), 122.16 (1978); SBA Manual ¶¶ 16–17, 21 (c), 23 (a)–(f), 29 (a) (8), 30 (*l*), 31 (b)(6); 7 CFR §§ 1801.1–1801.4, 1801.11, 1921.107, 1930.5 (1978).

[32] The Court of Appeals in No. 77–1644 believed that a uniform federal law was necessary to determine the sufficiency of the FHA's financing statement in part because the agency uses standard forms with preprinted descriptions of collateral commonly taken as security.   563 F. 2d, at 682. However, the form also has a blank space for listing specific property.   See App. in No. 77–1644, p. 12 (Form FHA 440–25).   And the FHA regulations advise that individual descriptions be made, specifically when "major items of equipment" are involved.   7 CFR §§ 1921.105 (e)(1), (2) (1978). Since the standard FHA forms leave spaces for recording the details of each loan, the agency can take account of local law without altering these materials.   See, *e. g.,* App. in No. 77–1644, p. 8 (Form FHA 440–4).

repayment of a federal loan." Brief for United States in No. 77–1359, p. 22. Therefore, the agencies conclude, just as "the purpose of the federal tax lien statute to insure prompt and certain collection of taxes" [33] justified our imposition of the first-in-time and choateness doctrines in the tax lien context, the federal interest in recovering on loans compels similar legal protection of the agencies' consensual liens. However, we believe significant differences between federal tax liens and consensual liens counsel against unreflective extension of rules that immunize the United States from the commercial law governing all other voluntary secured creditors. These differences persuade us that deference to customary commercial practices would not frustrate the objectives of the lending programs.

That collection of taxes is vital to the functioning, indeed existence, of government cannot be denied. *McCulloch* v. *Maryland,* 4 Wheat. 316, 425, 428, 431 (1819); *Springer* v. *United States,* 102 U. S. 586, 594 (1881). Congress recognized as much over 100 years ago when it authorized creation of federal tax liens. Act of July 13, 1866, ch. 184, § 9, 14 Stat. 107, recodified as amended in 26 U. S. C. §§ 6321–6323. The importance of securing adequate revenues to discharge national obligations justifies the extraordinary priority accorded federal tax liens through the choateness and first-in-time doctrines. By contrast, when the United States operates as a moneylending institution under carefully circumscribed programs, its interest in recouping the limited sums advanced is of a different order. Thus, there is less need here than in the tax lien area to invoke protective measures against defaulting debtors in a manner disruptive of existing credit markets.

To equate tax liens with these consensual liens also misperceives the principal congressional concerns underlying the respective statutes. The overriding purpose of the tax lien

---

[33] *United States* v. *Security Trust & Sav. Bank,* 340 U. S., at 51.

statute obviously is to ensure prompt revenue collection. The same cannot be said of the SBA and FHA lending programs.[34] They are a form of social welfare legislation, primarily designed to assist farmers and businesses that cannot obtain funds from private lenders on reasonable terms.[35] We believe that had Congress intended the private commercial sector, rather than taxpayers in general, to bear the risks of default entailed by these public welfare programs, it would have established a priority scheme displacing state law. Far from doing so, both Congress and the agencies have expressly recognized the priority of certain private liens over the agencies' security interests,[36] thereby indicating that the extraordinary safeguards applied in the tax lien area are unnecessary to maintain the lending programs.

The Government's ability to safeguard its interests in commercial dealings further reveals that the rules developed in the tax lien area are unnecessary here, and that state priority rules would not conflict with federal lending objec-

---

[34] Congress did not delineate specific priority rules in either the tax lien statute prior to 1966, the insolvency statute, or the statutes authorizing these lending programs. See nn. 6 and 8, *supra.* Accordingly, the Government urges that we establish identical priority rules for all three situations. This argument overlooks the evident distinction between lending programs for needy farmers and businesses and statutes created to guarantee receipt of debts due the United States. We, of course, express no view on the proper priority rules to govern federal consensual liens in the context of statutes other than those at issue here.

[35] See nn. 3 and 11, *supra;* 15 U. S. C. § 631 (1976 ed. and Supp. III) (declaration of policy); 7 U. S. C. § 1921 (congressional findings); 43 Fed. Reg. 55883 (1978) (to be codified in 7 CFR § 1941.2); S. Rep. No. 566, 87th Cong., 1st Sess., 1, 64 (1961); Hearings on H. R. 4384 before the House Committee on Agriculture, 78th Cong., 2d Sess., 43–45 (1944).

[36] A 1958 amendment to the Small Business Act subordinates SBA liens to state and local property tax liens when the tax liens would be superior to nonfederal security interests under state law. 72 Stat. 396, 15 U. S. C. § 646. The FHA has established by regulation that purchase-money security interests take priority over previously arising FHA liens. 7 CFR

tives.[37]   The United States is an involuntary creditor of delinquent taxpayers, unable to control the factors that make tax collection likely.   In contrast, when the United States acts as a lender or guarantor, it does so voluntarily, with detailed knowledge of the borrower's financial status.   The agencies evaluate the risks associated with each loan, examine the interests of other creditors, choose the security believed necessary to assure repayment, and set the terms of every agreement.[38]   By carefully selecting loan recipients and tailoring each transaction with state law in mind, the agencies are fully capable of establishing terms that will secure repayment.[39]

---

§ 1921.106 (1978); see § 1930.44.   In appropriate circumstances, the FHA also subordinates its liens to interests that are junior under state law. 7 U. S. C. § 1981 (d)   (1976 ed. and Supp. III); see, e. g., 7 CFR § 1930.30 (1978).

[37] We reject the Government's suggestion that the choateness and first-in-time doctrines are needed to prevent States from "undercutting" the agencies' liens by creating "arbitrary" rules.   Brief for United States in No. 77–1359, pp. 24–25.   Adopting state law as an appropriate federal rule does not preclude federal courts from excepting local laws that prejudice federal interests.   See, e. g., RFC v. Beaver County, 328 U. S., at 210; De Sylva v. Ballentine, 351 U. S., at 581; United States v. Little Lake Misere Land Co., 412 U. S., at 596.   The issue here, however, involves commercial rules of general applicability, based on codes that are remarkably uniform throughout the Nation.   See n. 28, supra.

[38] See nn. 30, 31, supra.

[39] The facts presented here demonstrate the ease with which the agencies could have protected themselves.   O. K. Super Markets informed the SBA of Kimbell's security interests in the inventory.   Had the agency followed its guidelines and checked local records, it would have discovered the 1968 security agreements Kimbell filed with its financing statements.   See SBA Manual ¶¶ 29 (a)(3), (4), (8), 31 (b)(6).   Thus, the agency should have known that the agreements secured future advances.   The SBA was also informed in the loan guarantee application that O. K. Super Markets intended to discharge the debts it owed Kimbell from the Republic loan proceeds.   See App. in No. 77–1359, p. 72.   Additionally, as a result of negotiations with O. K. Super Markets' creditors, the SBA was aware that Kimbell would not guarantee any portion of the Republic loan because it wanted its account paid in full before advancing further credit.   Id., at

The Government nonetheless argues that its opportunity to evaluate the credit worthiness of loan applicants provides minimal safety. Because the SBA and FHA make loans only when private lenders will not, the United States believes that its security interests demand greater protection than ordinary commercial arrangements. We find this argument unconvincing. The lending agencies do not indiscriminately distribute public funds and hope that reimbursement will follow. SBA loans must be "of such sound value or so secured as reasonably to assure repayment." 15 U. S. C. § 636 (a)(7); see 13 CFR § 120.2 (c)(1) (1978). The FHA operates under a similar restriction. 7 CFR § 1833.35 (1978). Both agencies have promulgated exhaustive instructions to ensure that loan recipients are financially reliable and to prevent improvident loans.[40] The Government therefore is in substantially the same position as private lenders, and the special status it seeks is unnecessary to safeguard the public fisc. Moreover, Congress' admonitions to extend loans judiciously supports the view that it did not intend to confer special privileges on agencies that enter the commercial field. Accordingly, we agree with the Court of Appeals in No. 77–1359 that "[a]s a quasi-commercial lender, [the Government] does not require . . .

---

62–63. In these circumstances, the SBA easily could have persuaded Kimbell either to subordinate its liens covering future advances or to terminate the 1968 security arrangements once the obligations were satisfied. This procedure, moreover, would have comported with agency practices. The SBA Manual allows employees to impose conditions on third parties when "advisable," and to note such agreements on the appropriate forms. *Id.*, ¶ 30 (e).

With respect to the FHA loan, the agency could have followed the practices of private lenders in protecting themselves from subsequent liens that take priority under state law. For example, the FHA might have secured its loan with property not subject to repairman's liens or demanded more substantial collateral.

[40] *E. g.*, 13 CFR § 120.2, as amended, 43 Fed. Reg. 3702 (1978); 13 CFR §§ 122.2, 122.3 (1978); SBA Manual ¶¶ 5–7; nn. 30, 31, *supra.*

the special priority which it compels as sovereign" in its tax-collecting capacity.   557 F. 2d, at 500.

The Federal Tax Lien Act of 1966, 80 Stat. 1125, as amended, 26 U. S. C. § 6323, provides further evidence that treating the United States like any other lender would not undermine federal interests.   These amendments modified the Federal Government's preferred position under the choateness and first-in-time doctrines, and recognized the priority of many state claims over federal tax liens.[41]   In enacting this legislation, Congress sought to "improv[e] the status of private secured creditors" and prevent impairment of commercial financing transactions by "moderniz[ing] . . . the relationship of Federal tax liens to the interests of other creditors."   S. Rep. No. 1708, 89th Cong., 2d Sess., 1–2 (1966); see also H. R. Rep. No. 1884, 89th Cong., 2d Sess., 35 (1966).   This rationale has even greater force when the Government acts as a moneylender.   We do not suggest that Congress' actions in the tax lien area control our choice of law in the commercial lien context.   But in fashioning federal principles to govern areas left open by Congress, our function is to effectuate congressional policy.   *E. g., RFC* v. *Beaver County,* 328 U. S. 204, 209–210 (1946).   To ignore Congress' disapproval of unrestricted federal priority in an area as important to the Nation's stability as taxation would be inconsistent with this function.   Thus, without a showing that application of state laws would impair federal operations, we decline to extend to new contexts extraordinary safeguards largely rejected by Congress.

[41] See nn. 6 and 8, *supra.*   Of particular relevance here, the Act added mechanic's liens to the list of private interests already protected against unrecorded tax liens. 26 U. S. C. § 6323 (a).   Holders of consensual security interests also receive priority over unrecorded tax liens. *Ibid.* Moreover, the Act gives priority to many types of nonfederal liens even when the Government has filed notice of the tax lien. § 6323 (b).   Included in this group are repairman's liens in personal property, § 6323 (b)(5), see n. 14, *supra,* and in limited situations, liens securing future advances.   § 6323 (c).

## C

In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved. Cf. *National Bank v. Whitney*, 103 U. S. 99, 102 (1881). However, subjecting federal contractual liens to the doctrines developed in the tax lien area could undermine that stability. Creditors who justifiably rely on state law to obtain superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence.[42]

Because the ultimate consequences of altering settled commercial practices are so difficult to foresee,[43] we hesitate to

---

[42] The cases under consideration illustrate the substantial new risks that creditors would encounter. Neither the financing statement filed by Republic nor its security agreement mentioned the SBA. App. in No. 77–1359, pp. 67–69. To give the federal lien priority in this situation would undercut the reliability of the notice filing system, which plays a crucial role in commercial dealings. Subsequent creditors such as Crittenden and prior creditors such as Kimbell would have no trustworthy means of discovering the undisclosed security interest. Even those creditors aware of a federal agency's lien would have to adjust their lending arrangements to protect against the stringent choateness requirements. In recognition of these burdens, commentators have criticized the doctrine for frustrating private creditors' expectations as well as generating inconsistencies in application. See, *e. g.*, 2 G. Gilmore, Security Interests in Personal Property 1052–1073 (1965); Plumb, Federal Liens and Priorities— Agenda for the Next Decade, 77 Yale L. J. 228 (1967); Kennedy, From Spokane County to Vermont: The Campaign of the Federal Government Against the Inchoate Lien, 50 Iowa L. Rev. 724 (1965); Kennedy, Relative Priority; Comment, The Relative Priority of Small Business Administration Liens: An Unreasonable Extension of Federal Preference?, 64 Mich. L. Rev. 1107 (1966).

Considerable uncertainty would also result from the approach used in the opinions below. Developing priority rules on a case-by-case basis, depending on the types of competing private liens involved, leaves creditors without the definite body of law they require in structuring sound business transactions.

[43] For example, the decision below in No. 77–1359 noted that priority rules favoring the Government could inhibit private lenders' extension of

create new uncertainties, in the absence of careful legislative deliberation. Of course, formulating special rules to govern the priority of the federal consensual liens in issue here would be justified if necessary to vindicate important national interests. But neither the Government nor the Court of Appeals advanced any concrete reasons for rejecting well-established commercial rules which have proven workable over time. Thus, the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation.[44]

## IV

Accordingly, we hold that, absent a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws. In No. 77–1359, the Court of Appeals found that Texas law gave preference to Kimbell's lien. We therefore affirm the judgment in that case. Although the issue was contested, the Court of Appeals in No. 77–1644 did not decide whether and to what extent Georgia treats repairman's liens as superior to previously perfected consensual liens. Nor did the court assess the sufficiency of the FHA's financing statement under Georgia law. Because "[t]he federal judges who deal regularly with questions of state law in their respective districts and circuits are in a better position than we to determine how local courts would dispose of [such] issues," *Butner* v. *United States, ante,* at 58 (footnote omitted), we vacate the judgment in No. 77–1644 and remand for resolution of these issues.

*So ordered.*

---

credit to the very people for whom Congress created these programs. 557 F. 2d, at 500. See MacLachlan, Improving the Law of Federal Liens and Priorities, 1 B. C. Ind. and Com. L. Rev. 73, 74–76 (1959).

[44] See *RFC* v. *Beaver County,* 328 U. S., at 209–210; *United States* v. *Brosnan,* 363 U. S., at 242; *United States* v. *Yazell,* 382 U. S., at 352, and nn. 26–27; *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S., at 68.