Bano BI, Individually and on Behalf of the Children of Rashid Kahn, and as Representative of the Estate of Rashid Kahn, et al., Plaintiffs–Appellants,

v.

UNION CARBIDE CHEMICALS AND PLASTICS COMPANY INC., et al., Defendants–Appellees.

Abdul WAHID, et al., Plaintiffs–Appellants,

v.

UNION CARBIDE CHEMICALS AND PLASTICS COMPANY INC., et al., Defendants–Appellees.

Nos. 253, 254, Dockets 92–7325, 92–7327.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1992.

Decided Jan. 26, 1993.

Benton Musslewhite, Houston, TX, for plaintiffs-appellants.

Bud G. Holman, New York City (Jeffrey S. Cook, Lisa E. Cleary, Kelley Drye & Warren, New York City, on the brief), for defendant-appellee Union Carbide Chemicals and Plastics Co. Inc.

E.R. Norwood, C. Clint Adams, Taylor & Norwood, Liberty, TX, submitted a brief for defendants-appellees Enserch Corp., Humphreys & Glasgow Consultants Pvt., Ltd., Humphreys & Glasgow, Ltd., and Ebasco–Humphreys & Glasgow, Inc.

Before NEWMAN, CARDAMONE, and MAHONEY, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents an interesting issue of comity among nations in the resolution of claims arising from torts occurring within a foreign country. The precise issue is whether the federal and state courts of this country should defer to the judgment of a democratic foreign government that disputes arising from a mass tort occurring within its borders can be best resolved by according the foreign government exclusive standing to represent the victims of the disaster in the courts of the world. This question arises on an appeal by a class of tort victims from the March 4, 1992, judgment of the District Court for the Southern District of New York (John F. Keenan, Judge) dismissing two complaints on the ground of *forum non conveniens*. We conclude that the plaintiffs lack standing and on that ground affirm.

### Background

On the night of December 2, 1984, the most devastating industrial disaster in history occurred when winds blew deadly gas from a plant operated by Union Carbide India Limited ("UCIL") into densely populated parts of Bhopal, India. On January 2, 1985, the Judicial Panel on Multidistrict Litigation assigned some 145 purported class actions filed in federal district courts across the United States to the Southern District of New York, where they became the subject of a consolidated complaint filed on June 28, 1985, before Judge Keenan. On March 29, 1985, India enacted the Bhopal Gas Leak Disaster (Processing of Claims) Act ("the Bhopal Act" or "the Act") granting to its government, the Union of India (referred to hereafter as "the Indian Government"), the exclusive right to represent the victims of the disaster in India or elsewhere. Pursuant to this authority, on April 8, 1985, the Indian Government filed a complaint in the Southern District of New York on behalf of all the

victims of the Bhopal disaster. The Indian Government's decision to bring suit in the United States was attributed to the fact that the Indian courts did not have jurisdiction over Union Carbide Corporation ("Union Carbide"),[1] UCIL's parent company.

In a thoroughly reasoned opinion, Judge Keenan granted Union Carbide's motion to dismiss the cases before him on the ground of *forum non conveniens* over the objections of the Indian Government and the individual plaintiffs. *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December 1984*, 634 F.Supp. 842 (S.D.N.Y.1986). Judge Keenan conditioned his dismissal on, among other things, Union Carbide's consent to the jurisdiction of the courts of India. We affirmed the District Court's decision after modifying it in a manner not relevant to the pending appeal. *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December 1984*, 809 F.2d 195 (2d Cir.), cert. denied, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987).

In September 1986, the Indian Government, acting pursuant to its authority under the Bhopal Act, brought suit on behalf of all claimants in the District Court of Bhopal. The litigation continued in India for more than two years. By orders dated February 14 and 15, 1989, the Supreme Court of India approved a settlement of "all litigations, claims, rights and liabilities related to and arising out of the [Bhopal] disaster." *Union Carbide Corp. v. Union of India*, 1989 [Supplement] S.C.A.L.E. 89, 90. Under the settlement, Union Carbide and UCIL agreed to pay $470 million to the Indian Government for the benefit of all victims of the Bhopal disaster. *See id.* at 91. On May 4, 1989, the Supreme Court of India set forth its reasons for concluding that the settlement was just and reasonable. *See Union Carbide Corp. v. Union of India*, 1989 [Supplement] S.C.A.L.E. 97. The Court was concerned primarily that the victims of the disaster receive immediate relief. *See id.* at 105–06. On December

---

1. Union Carbide has since changed its name to Union Carbide Chemicals and Plastics Company Inc.

22, 1989, in a related decision, the Court upheld the constitutional validity of the Bhopal Act and confirmed the Indian Government's exclusive authority to compromise all claims arising out of the Bhopal disaster. *See Charan Lal Sahu v. Union of India*, 1989 [Supplement] S.C.A.L.E. 1.

After settlement of the Indian lawsuit, two class actions were filed in Texas state courts in October 1990 seeking compensation for injuries caused by the Bhopal disaster. In one action, Abdul Wahid, as class representative, filed a suit against Union Carbide and UCIL. In the other action, Bano Bi, as class representative, filed a suit against Union Carbide, UCIL, Union Carbide Eastern, Inc., Enserch Corporation, Humphreys & Glasgow Consultants Pvt., Ltd., Humphreys & Glasgow, Ltd., and Ebasco–Humphreys & Glasgow, Inc. These class representatives, appellants on this appeal, contend that their collateral attack on the settlement of their claims by the Indian Government is proper because, among other things, the Indian Government had an unacceptable conflict of interest as part owner of UCIL, most of the victims oppose the settlement as grossly inadequate, and their due process rights were violated because they received inadequate notice and inadequate representation in the proceedings and because they could not opt out of the settlement.

Appellees removed these actions to two Texas federal district courts in November 1990. In the *Bi* action, Judge Fisher, of the Eastern District of Texas, dismissed as defendants Enserch Corporation, Humphreys & Glasgow Consultants Pvt., Ltd., Humphreys & Glasgow, Ltd., and Ebasco–Humphreys & Glasgow, Inc. He also denied Bi's motion to remand that action to the Texas state court. On January 30, 1991, the Judicial Panel on Multidistrict Litigation transferred these two actions to the Southern District of New York before Judge Keenan. Judge Keenan refused to reconsider Judge Fisher's rulings and denied Wahid's motion to remand his action to the Texas state court. Applying federal *forum non conveniens* law, Judge Keenan dismissed both actions; he held that the analysis and the results of his 1986 opinion were still appropriate.

## Discussion

■ This appeal presents an extraordinary collection of issues, but we have concluded that we need reach only the threshold issue of plaintiffs' standing to dispose of the appeal.[2] That issue is whether the

---

2. Our preference to discuss only the threshold issue of standing will be best understood by identifying the array of complex issues in this case that we need not reach. They are:

1. Whether the claim against the in-state defendants was so spurious on the merits that it was fraudulent for the plaintiffs to join them as defendants?

2. Whether the alien defendants, UCIL, Humphreys & Glasgow Consultants Pvt., Ltd., and Humphreys & Glasgow, Ltd., are amenable to long-arm service in Texas because of their contacts with Texas?

3. Whether the alien defendants were properly joined by asserting jurisdiction over their parent corporations?

4. Whether defendant Union Carbide Eastern, Inc., a Delaware Corporation with its principal place of business in Hong Kong, is considered an alien for purposes of diversity jurisdiction?

5. Whether removal of the state court actions was improper if the in-state defendants were properly joined?

6. Whether removal of the state court actions was improper if aliens were both plaintiffs and defendants?

7. Whether defendants are collaterally estopped to deny that removal was improper because of a remand ruling in a prior District Court suit in Texas?

8. Whether *forum non conveniens* is a matter of federal or state law?

9. Whether dismissal on *forum non conveniens* grounds was proper?

10. Whether, if removal was proper and *forum non conveniens* is a matter of federal law, a federal court, dismissing a suit on *forum non conveniens* grounds, should remand to state court, or dismiss because the removing parties are entitled to the benefit of the federal court *forum non conveniens* ruling, despite conflicting state law?

11. Whether the actions are barred by collateral estoppel arising from our 1987 ruling dismissing the earlier *Bhopal* action on *forum non conveniens* grounds?

12. Whether the actions are barred by accord and satisfaction, compromise and settlement, release, res judicata, merger and bar, or statute of limitations defenses?

Though the reader is entitled to wonder if these issues were thought up by a group of professors formulating final exams in federal

plaintiffs have standing to maintain this action in the courts of this country despite the Bhopal Act's delegation to the Indian Government of the exclusive right to represent those injured in the Bhopal disaster.

India passed the Bhopal Act to "secure that claims arising out of, or connected with, the Bhopal gas leak disaster are dealt with speedily, effectively, equitably and to the best advantage of the claimants." Preamble to Bhopal Act. To effectuate the swift and just resolution of claims, section 3 of the Act delegates to the Indian Government "the exclusive right to, represent, and act in place of (whether within or outside India) every person who has made, or is entitled to make, a claim for all purposes connected with such claim in the same manner and to the same effect as such person." This delegation includes the right to institute or withdraw a suit and to enter into a compromise. Section 3 also provides that, in cases pending as of the effective date of the Act in courts outside of India, the Indian Government would "represent, and act in place of, or along with, such claimant, if such court or other authority so permits." Section 4 of the Act permits individual claimants a limited right to participate in the proceedings. Section 4 states that the Indian Government "shall have due regard to any matters which such person may require to be urged with respect to his claim and shall, if such person so desires, permit at the expense of such person, a legal practitioner of his choice to be associated in the conduct of any suit or other proceeding relating to his claim."

The Supreme Court of India, in a lengthy opinion, concluded that the Bhopal Act was constitutional under the Indian Constitution and that the Act violated no principles of natural justice. In so ruling, the Indian Court rejected many of the same arguments that appellants urge in this Court. The Indian Court held that the Indian Government's exclusive representation of all victims in its sovereign capacity would be constitutional as long as the Indian Government assumes the obligation to pay the victims interim relief or maintenance until

monies are realized from Union Carbide, because the Indian Government's exclusive representation deprived the victims of their right to seek immediate relief from Union Carbide themselves. *See Charan Lal Sahu,* 1989 [Supplement] S.C.A.L.E. at 53–54. The Court excused the Indian Government's failure to give notice of the settlement to each of the several hundred thousand claimants prior to approving the settlement. It reasoned that although the lack of notice may affect the appearance of justice, justice was in fact done because the arguments against settlement were adequately advocated by those who were aware of the settlement and argued against it. *See id.* at 63–65. In sum, the Court confirmed that as far as Indian law is concerned, the Bhopal Act's grant of exclusive standing to the Indian Government was proper.

We are faced with what we believe is an issue of first impression. We must decide whether we will give effect to the statute of a foreign government that purports to grant that government exclusive standing to represent the victims of a mass tort that occurred within its borders. India is a democracy. Its Constitution, which took effect in 1950, provides for a republican form of parliamentary government and guarantees the fundamental rights of the people, including equal protection and procedural due process. *See* Chun–Chi Young, *The Legal System of the Republic of India, in 9 Modern Legal Systems Cyclopedia* 9.80.1, §§ 1.3(A), 1.3(B)(2)(b) (Kenneth R. Redden & Linda L. Schlueter eds., 1990). Its President is chosen for a five-year term by an electoral college consisting of the elected members of the Parliament and the state legislatures. *See id.* at § 1.3(A)(1). The President selects the justices of the Supreme Court and other high courts. *See id.* The *de facto* executive is the Prime Minister, who is elected by the parliamentary members of the majority party. *See id.* The Parliament consists of two houses: the Council of States, which consists of state representatives chosen primarily by the state assemblies along with 12 members

jurisdiction and civil procedure, they are actually presented in this one appeal.

nominated by the President, and the House of the People, which is directly elected. *See id.* at § 1.3(A)(2). Judicial independence is a basic principle of India's Constitution. *See id.* at § 1.3(B)(2)(d). The members of the Supreme Court are guaranteed tenure until age 65 and can be removed only for incompetence or misconduct by a vote of a majority of all the members of each house and two-thirds of those voting. *See id.* at § 1.4(A).

India has chosen a system to deal efficiently with a problem of mass proportions that occurred within its borders. It decided in an act passed by its democratic parliament to represent exclusively all the victims in a suit against Union Carbide and to use the money it received in settlement of that suit to fund a plan framed, pursuant to the Bhopal Act, to process the claims of all the victims. Union Carbide's negotiations with the Indian Government were conducted under the assumption that the settlement amount covered all claims. To grant the victims of the Bhopal disaster, most of whom are citizens of India, access to our courts when India has set up what it believes to be the most effective method of dealing with a difficult problem would frustrate India's efforts.

Under the act of state doctrine, we will not sit in "judgment on ... acts of a governmental character done by a foreign state within its own territory and applicable there." *See* 1 *Restatement (Third) of the Foreign Relations Law of the United States* § 443 (1987). Although the act of state doctrine is not precisely applicable here, the concerns underlying it support our result. That doctrine has " 'constitutional' underpinnings" and "arises out of the basic relationships between branches of government in a system of separation of powers." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). Our Supreme Court was concerned that the Judicial Branch's "passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* Here too, were we to pass judgment on the validity of India's response to a disaster that occurred within its borders, it would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future.

It is not relevant to our determination whether, under our constitutional standards, our Government could pass an act similar to the Bhopal Act. We are deferring to the statute of a democratic country to resolve disputes created by a disaster of mass proportions that occurred within that country. Any challenge appellants may have to the settlement must be made through the legislative or judicial channels that are available in India. We hold that when a recognized democracy determines that the interests of the victims of a mass tort that occurred within its borders will be best served if the foreign government exclusively represents the victims in courts around the world, we will not pass judgment on that determination, and we will permit only the foreign government access to our courts to litigate those claims, subject of course to our own requirements for standing. This conclusion is especially compelling in a case such as this where almost all of the victims are Indian citizens.

■ Since our resolution of the standing issue permits us to dispose of the appeal, the only remaining issue is whether we should affirm the judgment dismissing the complaints or remand with directions to remand the suits to the Texas state court. Whether or not a remand would be appropriate if the state court were free to apply its own law of standing, in this case federal law applies. The question whether courts in our federal system must respect an act of a foreign country that purports to deprive the victims of a mass tort of standing to sue in our courts is a question of federal common law binding on state and federal courts alike. The considerations underlying this determination implicate the relationship between our nation and India and are uniquely federal in nature. *See Sabbatino,* 376 U.S. at 424–25, 84 S.Ct. at 938. Furthermore, permitting individual states

to develop rules to determine the Bhopal Act's effect on standing in their courts would frustrate the need for a uniform policy on matters of foreign relations. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).

Because the Texas state courts, applying federal common law, would be obliged to reach the same conclusion regarding appellants' lack of standing that we have reached, a remand would be pointless. We therefore affirm the District Court's judgment of dismissal.